## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:

TERRY HONG-YIN CHAN and                          Case No.:  6:18-bk-03297-KSJ
JACQUELYN ANGIULLI CHAN,

            Debtors.                          Chapter 7

_____/

JIAXI HU, MENGFANG LI, XIAOYAN
WU, WEI REN, RUIMIN CHEN, JIANLI
DU, JIMEI ZHANG, ZHENPING HAO, JIE
CUI and GUIYING WANG,

            Plaintiffs.

v.                                               Adv. Proc. No.

TERRY HONG-YIN CHAN and
JACQUELYN ANGIULLI CHAN,

            Defendants.

_____/

## ADVERSARY COMPLAINT TO DETERMINE
## DISCHARGEABILITY OF DEBTS

Plaintiffs, Jiaxi Hu, Mengfang Li, Xiaoyan Wu, Wei Ren, Ruimin Chen, Jianli Du, Jimei

Zhang (collectively the "Initial Chinese Victims") and Zhenping Hao, Jie Cui, and Guiying

Wang (collectively, the "Additional Chinese Victims") (the Initial Chinese Victims and the

Additional Chinese Victims are sometimes hereinafter referred to as the "Plaintiffs") file this

*Complaint to Determine Dischargeability of Debts* and sue Terry Hong-Yin Chan and Jacquelyn

Angiulli Chan (together, the "Debtors" or "Defendants") as follows:

## INTRODUCTION

1.      Plaintiffs are the victims of a $5,000,000 plus fraud, theft, and conspiracy, in

which a web of individuals, primarily based in Hamilton County, Ohio, preyed on foreign

{2247/000/00414974}

Chinese nationals who want to leave China to provide their families with the opportunity for a better life in the United States through the EB-5 program. Indeed, the Initial Chinese Victims and the Additional Chinese Victims were willing to put their lifesavings at risk in order to attempt to obtain visas and have the chance to permanently live and work in the United States.

2.     In order to induce Plaintiffs into investing so much money, Terry Chan and Kentucky Regional Center d/b/a Midwest EB-5 Regional Center ("KRC") (together the "KRC Conspirators") made a host of false and misleading statements regarding the "Short Vine Entertainment District," a purported Cincinnati real estate project (the "Project") that was supposed to be renovated, developed and operated using Plaintiffs' EB-5 investments. The KRC Conspirators stole Plaintiffs' money and never came across with the permanent visas they had promised would be obtained.

3.     In addition to the KRC Conspirators, there were non-party co-conspirators who were integrally involved in defrauding Plaintiffs. Those non-parties include Patricia C. Angiulli, Belinda P. Angiulli, Jennifer L. Bardyguine, Martin Angiulli, who is Terry Chan's father-in-law ("Angiulli"), Jeffrey Jacobs, Angiulli, Inc. and SV, ARX, LLC ("SV ARX") (collectively, the "Non-Party Participants").

4.     The Debtors, KRC Conspirators and Non-Party Participants (together the "Conspirators") targeted investors with children between the ages of 18 and 21 because, under the EB-5 program, applicants have the right to apply for a green card for themselves, their spouse and unmarried children under 21. To be clear, 8 of 10 Plaintiffs (with the exception of Cui Jie and Mengfang Li) had minor children at the time they invested. Once the investors' funds were stolen and time continued to pass without the issuance of their I-526 approvals, the Conspirators would threaten to "blow-up" the I-526's if the Plaintiffs and their consultants and agents did not

continue to cooperate with them.  The immigration consultants and agents took this to mean that if they did not do as they were told, Plaintiffs and their spouses and children would no longer be able to obtain their green cards, would lose their investments and would have to either start all over with a new EB-5 program or lose the ability to ever become permanent residents of the United States.

5.      At all times relevant to this Case, the Conspirators presented themselves and held themselves out as experts in the EB-5 program and as successful real estate developers who were ready, willing and able to renovate, develop and operate the Project.  By so doing, and by convincing Plaintiffs of the veracity of such statements, the Conspirators became Plaintiffs' fiduciaries and owed them fiduciary duties, including the duties of loyalty and due care.

6.      The Project and the story behind it were, in reality, nothing more false pretenses intended to steal every penny of Plaintiffs' money and distribute among the Conspirators, all of whom were co-conspirators.  Indeed, the Initial Chinese Victims and the Additional Chinese Victims were each fraudulently induced to become a limited partner in KRC Fund I LP (the "Fund").  The KRC Conspirators' ultimate goal was to identify and convince 40-46 unwary investors (for a total of $20 million - $23 million to steal) to buy-in to the Project.  Besides the $5,000,000 plus at issue in this case, KRC Conspirators still snared 4 additional investors (not plaintiffs here) and $2 million more before all was said and done and they were exposed.

7.      As described more specifically below, the Conspirators told the Plaintiffs, in varying combinations, the following critical and material lies, among others:

> (a)      There was a 100% guarantee by the State of Ohio for the return of Plaintiffs' investment and fees in the event their I-526 applications that they had to file in order to get their visas (the "I-526's") approved by the U.S. Department of Homeland Security – Citizenship and Immigration Service ("USCIS") were not approved;

(b)      The 100% guarantee by the State of Ohio was the only government guarantee of an EB-5 program in the United States;

(c)      100% of the Initial Chinese Victims funds would be held in escrow until their I-526's were approved by USCIS and 100% of the Additional Chinese Victims funds would be untouched and not spent unless and until their I-526's were approved by the USCIS;

(d)      Plaintiffs' funds would be exclusively invested in the restoration, development and operation of 9 buildings in the Short Vine Entertainment District;

(e)      KRC Conspirators had obtained additional forms of Non-EB-5 financing to help restore, develop and operate the 9 buildings in the Short Vine Entertainment District, including $2,500,000 from the Streetscape Program, $1,000,000 from a Façade Improvement Program, $3,000,000 from "NMTC," and a total of $16,000,000 from Cincytech Fund II, Ohio Third Frontier, Cincinnati Children's Hospital, Castellini Foundation and U.S. Bank Foundation;

(f)      The 9 buildings that were being restored developed and operated would be completed within about a year of obtaining EB-5 financing;

(g)      The funds would create 581 jobs, more than the required 460 full-time jobs for the offering; and

(h)      JPMorgan Chase Bank, N.A. had provided a guaranteed $20 million bank loan to insure the smooth completion of the Project.

8.      The Conspirators intended for the Plaintiffs to rely on each and every one of the false and misleading statements that they were subjected to. At the time the Conspirators made the false and misleading statements, they knew they were untruthful and had no intention to fulfill the promises made to induce Plaintiffs to invest their money in the Project. Because of the positions of trust that the Conspirators had assumed, Plaintiffs did trust and rely on the false and misleading statements when they invested in the Project.

9.      If and when Plaintiffs' I-526's were approved, use of the funds was strictly limited to creating at least 10 full-time jobs for qualifying U.S. workers, in this case by:

(a)      renovating, developing and operating 9 buildings in the Short Vine Entertainment District;

(b)    serving Hamilton County by seeking to create jobs and increase U.S. exports by developing restaurants, retail space and (potentially) office space and student housing; and

(c)    creating at least 551 direct and indirect jobs to support the EB-5 guidelines and the number of investors sought.

10.    As described in detail below, none of the false and misleading statements set-forth above, and described in greater detail below, were true.  There was no 100% guarantee of Plaintiffs investments by the State of Ohio.  The Initial Chinese Victims' funds were not held in an escrow account until their I-526's were approved by USCIS (they were spent almost immediately).  The Additional Chinese Victims' funds were not untouched and not spent unless and until their I-526's were approved by USCIS (they were spent almost immediately).  Virtually none of Plaintiffs' funds were exclusively invested in the restoration, development and operation of the Project.  No non-EB-5 funding had been obtained.  The Project was never completed.  Virtually no EB-5 jobs were created.  And there was no guaranteed $20 million in JPMorgan Chase Bank, N.A. financing for the Project.

11.    Even worse, none of the Initial Chinese Victims or the Additional Chinese Victims have obtained permanent green cards.

12.    Nine of the ten Plaintiffs' I-526's visa applications were approved by USCIS in January 2014 (Plaintiff Guiying Wang's I-526 visa application has never been approved).  The I-526's were revoked by USCIS as a result of KRC Conspirators' mismanagement of Plaintiffs' EB-5 investments, failure to create jobs and failure to make sufficient (or really any) progress in the renovation, development and operation of the Project, (and Plaintiff Guiying Wang's I-526 visa application was denied).  While Plaintiffs are appealing USCIS' actions, their visas are in serious jeopardy.  Plaintiffs have lost all of their investment monies.

13.     Instead of using Plaintiffs' investments to fund the Project, the Conspirators stole

Plaintiffs' funds and used them to:

(a)     Pay personal expenses and finance lifestyles beyond their means, taking money and diverting it from the stated uses, i.e., – creating jobs to enable visas under the EB-5 program;

(b)     make investments in high-risk, low-reward technology companies that were not approved businesses to be conducted by the Regional Center, were not part of the Regional Center's approved business plan, were in violation of EB-5 investment rules and were for the personal aggrandizement of Terry Chan and Gary Chan – none of which created jobs under the EB-5 program or benefitted the Project or the Plaintiffs in any way;

(c)     pay mortgages, taxes and business expenses for properties and businesses that were not owned by or related to the Project, including but not limited to Martinos, a restaurant owned by Angiulli;

(d)     purchase the Colonade, a parcel of property located at 2718 Vine Street, Cincinnati, Ohio, using Plaintiffs' EB-5 investment money, which generated $13,000 in rental income that was never used for the benefit of the Project or the Plaintiffs;

(e)     obtain a $250,000 line of credit with U.S. Bank collateralized by the Colonade, which was drawn down and used by Angiulli and Terry Chan, and not for the benefit of the Project or Plaintiffs – the Colonade was later sold, the line of credit was paid off and Angiulli and Terry Chan pocketed the proceeds, none of which was used to create jobs for the EB-5 program or for the benefit of Plaintiffs;

(f)     make payments to Jacquelyn Chan and certain Non-Party Participants (in order to obfuscate the fact that they were rewarding and compensating Jacquelyn Chan and certain Non-Party Participants for aiding and abetting them in their fraudulent scheme and acting as their co-conspirators);

(g)     create fictitious "jobs" and "employment agreements" to make it look like some of Jacquelyn Chan and certain Non-Party Participants were earning the money that was being stolen from Plaintiffs, but both the "jobs" and the "employment agreements" were smokescreens and Jacquelyn Chan and certain Non-Party Participants were not legitimate employees of the Non-Party Participants; and

(h)     cover regional center expenses that were not in furtherance of job creation which the USCIS prohibits for use of EB-5 capital investment funds, including marketing expenses and trips to China, Las Vegas and London.

14.     Plaintiffs demanded an accounting for all of the EB-5 money used.   On information and belief, the Conspirators used Plaintiffs' stolen funds for other illegal purposes other than those identified herein.  Plaintiffs expect that, through discovery and an accounting, the Conspirators' uses of the rest of the stolen EB-5 money will come to light.

15.     At all material times the Conspirators kept Plaintiffs in the dark, engaging in a practice of lulling.  The Conspirators "updated" Plaintiffs on the Project (by and through their immigration consultants and agents), each time telling them that the Project was progressing (as were their I-526's).  This was done so Plaintiffs would continue to believe that their monies were safe.  It was also done to manipulate and encourage immigration consultants and agents to search for more unsuspecting investors in order to keep Conspirators' grand scheme going.  Kept in the dark by the ongoing misrepresentations regarding the progress and success of the Project, the immigration consultants and agents did their jobs, searching for more EB-5 investors willing to invest.

16.     Plaintiffs are foreign nationals that were fraudulently induced to each invest $500,000, plus $45,000 in administrative fees, based on the representations made by the Conspirators.   As more fully detailed below, Terry Chan, Gary Chan, Martin Angiulli, and Jeffery Jacobs helped to create, compile, generate (in the State of Ohio) and distribute (in the State of Ohio and in China) false and misleading brochures (the "Brochures") and PowerPoint presentations ("PowerPoint") containing numerous material false and misleading statements to the Initial Chinese Victims and the Additional Chinese Victims.

17.     In addition, Terry Chan, Gary Chan, Angiulli and Jeffery Jacobs, individually and on behalf of KRC, travelled to China, where they attended presentations and made false and misleading statements to the immigration agents and consultants representing Plaintiffs,

intending that the agents and consultants would repeat the false and misleading statements to Plaintiffs, and knowing specifically that they would do so, because that is how EB-5 investors are wooed in China.

18.    Moreover, Terry Chan, Gary Chan, Martin Angiulli and Jeffery Jacobs, individually and on behalf of KRC, brought the false and misleading Brochures and PowerPoint with them to China, showed the PowerPoint to investors and their immigration consultants and agents and passed-out and otherwise made available the false and misleading Brochures to them. Once again, Terry Chan, Gary Chan, Martin Angiulli and Jeffery Jacobs, individually and on behalf of KRC, knew specifically that the immigration consultants and agents would disseminate the false and misleading information contained in the PowerPoint presentations and the Brochures to unsuspecting potential EB-5 investors, and intended for them to do so.

19.    In addition to acting individually, Gary Chan and Terry Chan caused their alter ego, KRC, to create, compile, generate (in the State of Ohio) and distribute (in the State of Ohio and in China) the false and misleading Brochures to the Initial Chinese Victims and the Additional Chinese Victims. Gary Chan and Terry Chan, at substantially all times relevant to this case, exercised such complete control over KRC that KRC had no separate mind, will or existence of its own. Gary Chan and Terry Chan's control over KRC was exercised in such a manner as to commit fraud and illegal acts against Plaintiffs, such that Plaintiffs suffered injury and unjust loss as a result of Gary Chan and Terry Chan's complete control of KRC.

20.    To be clear, Gary Chan and Terry Chan and KRC are fundamentally indistinguishable. As a result of Gary Chan and Terry Chan's domination of KRC, during all relevant times, KRC was inadequately capitalized, both Gary Chan and Terry Chan siphoned off KRC's assets for personal expenditures and use, KRC was unable to pay debts due to high

salaries or loans to Gary Chan, Terry Chan and others, and Gary Chan and Terry Chan disregarded corporate roles and corporate formalities, failing to properly and adequately maintain corporate records.    In addition, Gary Chan and Terry Chan, on information and belief, commingled corporate and personal funds and used KRC's corporate property for personal purposes.

21.    Plaintiffs ask the Court to deem the debts owed to them by the Debtors as a result of this scheme non-dischargeable in bankruptcy.

## PARTIES, JURISDICTION, AND VENUE
### The Plaintiffs

22.    Jiaxi Hu is a citizen and resident of the People's Republic of China.  Jiaxi Hu invested $500,000 in the EB-5 program plus a $45,000 administrative fee on October 6, 2011.

23.    Mengfang Li is a citizen and resident of the People's Republic of China. Mengfang Li invested $500,000 in the EB-5 program plus a $45,000 administrative fee on November 3, 2011.

24.    Xiaoyan Wu is a citizen and resident of the People's Republic of China.  Xiaoyan Wu invested $500,000 in the EB-5 program plus a $45,000 administrative fee on November 13, 2011.

25.    Wei Ren is a citizen and resident of the People's Republic of China.  Wei Ren invested $500,000 in the EB-5 program plus a $45,000 administrative fee on November 21, 2011.

26.    Ruimen Chen is a citizen and resident of the People's Republic of China.  Ruimen Chen invested $500,000 in the EB-5 program plus a $45,000 administrative fee on November 25, 2011.

27.    Jianli Du is a citizen and resident of the People's Republic of China.  Jianli Du invested $500,000 in the EB-5 program plus a $45,000 administrative fee on December 12, 2011.

28.    Jimei Zhang is a citizen and resident of the People's Republic of China.  Jimei Zhang invested $500,000 in the EB-5 program plus a $45,000 administrative fee on December 28, 2011.

29.    Zhenping Hao is a citizen and resident of the People's Republic of China. Zhenping Hao invested $500,000 in the EB-5 program plus a $45,000 administrative fee on July 30, 2012.

30.    Jie Cui is a citizen and resident of the People's Republic of China.  Jie Cui invested $500,000 in the EB-5 program plus a $45,000 administrative fee on August 2, 2012.

31.    Guiying Wang is a citizen and resident of the People's Republic of China. Guiying Wang invested $500,000 in the EB-5 program plus a $45,000 administrative fee on September 26, 2012.

32.    Each Plaintiff is a limited partner in the Fund.  The Fund is an Ohio limited partnership with its principal place of business located in Cincinnati, Hamilton County, Ohio. Gary Chan and Terry Chan formed the Fund, an Ohio limited partnership, on or about October 16, 2010 in Cincinnati, Ohio purportedly for the purpose of raising funds from the solicitation of foreign investors to invest in the Project.  Plaintiffs were fraudulently induced to each invest $500,000 into the Fund in exchange for an interest, the false promises of United States EB-5 visas, and the ultimate return of their investments, with interest.  Gary Chan and Terry Chan used KRC, their alter ego, to manage the Fund and utilize it to collect the EB-5 investments.

33.    Plaintiffs have filed a lawsuit against Terry Chan, Gary Chan, KRC, Gary M. Bassett, Christopher M. Lacey, Jacquelyn Angiulli Chan, Patricia C. Angiulli, Belinda P.

Angiulli and Jennifer L. Bardyguine in the United States District Court for the Southern District of Ohio, Case No. 1:15-cv-709-SSB-SKB (the "Ohio Case"), as a result of the scheme outlined *supra*.[1]  Such persons, with the exceptions of Gary M. Bassett and Christopher M. Lacey, shall be referred to herein as the "Ohio Defendants").

34.     Plaintiffs are each creditors of the Debtors within the meaning of 11 U.S.C. § 101(10).

## The Defendants

35.     Terry Chan is a citizen of the State of Florida, a resident of Orlando, Orange County, Florida and a former principal of KRC.  During much of the time relevant to this case, Terry Chan was a citizen of the State of Ohio and a resident of Hamilton County, Ohio. Upon information and belief, Terry Chan was one of the masterminds behind the Short Vine Entertainment District fraudulent scheme, and organized all the players and their respective roles.  Terry Chan and his accomplices made material, false representations to Plaintiffs, by and through their immigration consultants and agents, which induced them to provide and continue with their investments.

36.     Jacquelyn Angiulli Chan is a citizen of the State of Florida and a resident of Orlando, Orange County, Florida, who, on information and belief, conspired with and aided and abetted the Conspirators to defraud Plaintiffs – and also was unjustly enriched when she took and accepted Plaintiffs' EB-5 investment money before the I-526's were approved by USCIS. During much of the time relevant to this case, Jacquelyn Angiulli Chan was a citizen of the State of Ohio and a resident of Hamilton County, Ohio.  Jacquelyn Angiulli Chan is Terry Chan's wife and Angiulli's daughter.

---

[1]     Certain of these parties have been voluntarily dismissed from the case.

37.     On June 1, 2018 Terry Chan and Jacqulyn Angiulli Chan filed a joint voluntary petition for relief under chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, initiating the above-captioned bankruptcy case.

### Jurisdiction and Venue

38.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b).  The is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

39.     Venue is proper pursuant to 28 U.S.C. § 1409 because the bankruptcy case of the Debtors is pending in this district.

40.     All conditions precedent to this action have been performed, have occurred or have been waived.

41.     Plaintiffs have retained the undersigned counsel to represent them in this action and have agreed and obligated to pay a reasonable fee for their services.

### GENERAL ALLEGATIONS
### EB-5 Visa Program in General

42.     The Immigrant Investor Program, more commonly known as the EB-5 program, was created by the Immigration Act of 1990.  Congress established the EB-5 program to stimulate the U.S. economy by giving immigrant investors the opportunity to permanently live and work in the United States after they have invested in a new commercial enterprise ("NCE"). In the case of an NCE that is located in a Targeted Employment Area ("TEA"), *i.e.,* either a rural area or an area beset by high unemployment, the required equity investment need only be $500,000.

43.     In 1993, Congress created the Immigrant Investor Pilot Program to increase interest in the EB-5 visa program. This new pilot program established EB-5 regional centers

which are entities that receive special designation from the USCIS to administer EB-5 investments and create jobs. Public and private entities may apply to the USCIS for approval as an EB-5 regional center.

44.    EB-5 visa programs administered by a regional center provide more flexibility, because the immigrant investor who invests in such a program is permitted to take credit not only for direct jobs created in the NCE but also "indirect jobs" created outside the NCE in a job creating enterprise ("JCE"), such as a construction contracting firm that builds an improvement for the NCE. In addition, the immigrant investor need not handle the day-to-day management of the NCE or even necessarily live in the region where the NCE is located.

45.    By necessity, investments into an EB-5 program are "closed-ended," available only to a specified number of investors, and that number is tied to the number of direct or indirect jobs created by the investment. If too few jobs are created with the money invested, the immigrant will not be able to become a permanent resident in the United States.

### EB-5 Practice and Procedure

46.    Under the EB-5 program, the immigrant investor first applies for an immigrant visa by submitting a Form I-526, Immigrant Petition for Alien Entrepreneur. USCIS' approval of the Form I-526 is conditioned upon the immigrant's investment of the requisite amount of money in an NCE that satisfies the applicable legal requirements. Upon approval of the Form I-526 petition, the immigrant investor may either: (1) file the appropriate form to adjust their status to a conditional permanent resident within the United States; or (2) file an application to obtain an EB-5 visa for admission to the United States. Upon the approval of the application or upon entry into the United States with an EB-5 immigrant visa, the EB-5 investor and derivative family members will be granted conditional permanent residence for a two-year period.

47.    To remove the conditional resident status, the immigrant investor must file a Form I-829, Petition by Entrepreneur to Remove Conditions, ninety days before the two-year anniversary of the granting of the EB-5 investor's conditional resident status. USCIS' approval of the Form I-829 is conditioned upon proof that the immigrant investor's investment has created at least ten full-time jobs in the NCE or JCE. If an insufficient number of jobs was created, the foreign national is subject to removal from the United States.

### EB-5 Program at the Short Vine Entertainment District

48.    KRC held itself out as an EB-5 regional center, which was approved by USCIS on April 29, 2010 for participation in the Immigration Investor Program as a designated regional center.  The approval by KRC as a regional center allowed EB-5 investors to take credit for direct and indirect jobs and not be involved in the day-to-day operation of the NCE.  KRC was operated and controlled by Gary Chan, Terry Chan and, once he become involved, Angiulli.

49.    Gary Chan, Terry Chen, Angiulli, and Jeffery Jacobs, individually and on behalf of KRC, at all material times, presented themselves and held themselves out as experts in the EB-5 program and very experienced and successful EB-5 developers who were willing, ready and able to obtain permanent visas for Plaintiffs while guaranteeing their investments.  Plaintiffs had a wide-variety of choices when choosing which EB-5 project to invest in, but they relied on the KRC Conspirators and Non-Party Participants' many oral and written representations, which were made individually and on behalf of KRC, when making their decisions.  KRC Conspirators and Non-Party Participants set out to earn Plaintiffs' trust, by hook or by crook, and accomplished that goal. As such, Ohio Defendants owed Plaintiffs a fiduciary duty to protect their interests.

50.     Based on the initial designation of KRC as an EB-5 regional center, it obtained approval for the following geographic areas: Campbell, Kenton and Boone Counties in Kentucky as well as Hamilton, Butler, Clermont and Warren Counties in Ohio.

51.     Based on the initial designation of KRC as an EB-5 Regional Center, it obtained approval for the following industry categories: (a) 72111 – Hotels; (b) 72211 – Restaurants; (c) 4230 – Other Miscellaneous Store Retailers; (d) 531311 – Condominium managers' offices, residential; (e) 5311 – Lessors of Real Estate; (f) 339 – Miscellaneous Manufacturing; and (g) Community Care Facilities for the Elderly.  Significantly, KRC was not approved for any industry categories having anything to do with technology, medical technology, or investments in technology or medical technology.  This is relevant to the fraudulent scheme as Terry Chan made false and misleading statements to the Initial Chinese Victims and the Additional Chinese Victims that technology and medical companies and technology and medical company investments were permissible categories and functions of KRC.  They were not.

52.     As part of KRC's original designation as a regional center, USCIS also approved the Manhattan Harbour Project and related organizational documents for MH Entertainment I Regional Center Partnership.  The Manhattan Harbour Project planned to redevelop the Dayton, Kentucky riverfront as a mixed-use residential-commercial development.  On information and belief, Gary Chan and Terry Chan were never able to obtain either EB-5 financing or non-EB-5 financing with respect to the Manhattan Harbour Project, so it never even got off the ground.

53.     On November 22, 2010, KRC filed an amendment to its regional center designation, seeking a preliminary determination of EB-5 compliance for a project involving Non-Party SV ARX.  The amendment also requested the addition of Healthcare, Technology, Life Sciences and Research and Development as approved industries for the regional center.

There were several USCIS Requests for Evidence and responses from KRC related to this amendment.  In one of these responses, KRC included a Certificate of Assumed Name on May 11, 2010 with the Kentucky Secretary of State showing the name of Kentucky Regional Center, LLC as Midwest EB-5 Regional Center.

54.     As part of the response to a Request for Evidence from USCIS related to the November 22, 2010 amendment, KRC included a Statement of Managing Principals dated August 20, 2012.  The statement indicated that KRC withdrew the SV ARX Project (i.e., The Project) from USCIS consideration and withdrew the request to add Healthcare, Technology, Life Sciences and Research and Development as related industries.  This is additional evidence that Ohio Defendants knew that KRC was not permitted to pursue technology and technology related activities and investments when spending the proceeds from Plaintiffs' EB-5 investments, even when Ohio Defendants were telling Plaintiffs that they could in order to induce Plaintiffs to invest in Ohio Defendants' scam.

55.     The Project was later introduced as KRC's EB-5 project in the filing of Plaintiffs' I-526's.

56.     On February 25, 2013, USCIS issued a Notice of Intent to Deny the November 22, 2010 amendment since the amendment was initially based on the Project and industries purportedly related to the Project.  On March 27, 2013, KRC filed a response to the Notice of Intent to Deny which included a Statement of Managing Principals dated March 25, 2013.  This statement indicated that the only outstanding amendment request was the addition of four industry categories as a correction to KRC's initial approval notice.

57.     On June 25, 2013, USCIS approved the request to amend the regional center designation by adding the following four categories: (a) 2361 – Residential Building

Construction; (b) 23622 – Commercial and Institutional Building Construction; (c) Limited-Service Restaurants; and (d) Full-Service Restaurants.   Again this amended regional center designation did not permit KRC to pursue technology and technology related activities and investments when spending the proceeds from Plaintiffs' EB-5 investments.  As described more fully below, as a direct result of Ohio Defendants fraudulent scheme, mismanagement of the Project and theft of Plaintiffs' EB-5 investments, USCIS ultimately terminated the regional center and denied all of the Plaintiffs' I-526's, virtually insuring that the Initial Chinese Victims and Additional Chinese Victims would never realize their dreams of obtaining permanent residence in the United States.   Unfortunately for them, Ohio Defendants' scam worked perfectly.

<u>**How Plaintiffs Were Scammed**</u>

58.    In order to prepare to defraud the Initial Chinese Victims and the Additional Chinese Victims (with the goal of eventually identifying and scamming a total of 40-46 Chinese investors), Ohio Defendants first compiled a team of people who agreed to be associated with the Project in order to give Ohio Defendants "instant credibility."  That "credibility team" included: (a) Stephen Yale-Loehr - Cornell educated immigration lawyer who supposedly had filed "over 200 I-526 petitions so far in 2010;" (b) Dr. Paul Sommer – a PhD from Yale and expert in economic studies for EB-5 regional center applications and verification of project creation numbers; (c) Paul Darpel – real estate and corporate lawyer; (d) Paul Gallenstein – 4th generation owner of Gallenstein Companies, and Infrastructure Engineer; (e) Andrew Moffe – Director of Operations from General Electric Company; and (f) Martin Lawler – an EB-5 immigration lawyer who supposedly had a "100% success rate" with I-526 petitions.  This is in addition to

Gary Chan, Terry Chan, Angiulli and Jeffery Jacobs, individually and on behalf of KRC, all referring to themselves as experts in their respective fields, including in EB-5 programs.

59.    Next, Terry Chan, Gary Chan, Angiulli, and Jeffrey Jacobs individually and on behalf of KRC, generated, compiled, gathered and organized information (in the State of Ohio) that was utilized to create false and misleading statements to be used to defraud potential EB-5 investors. (The Subscription Agreements, the PPMs and the Limited Partnership Agreement, as those terms are defined in hereinbelow are sometimes referred to collectively as the "Offering Documents").   These false and misleading statements were included in marketing materials, including the PowerPoint, the Brochures and Offering Documents (created in the State of Ohio) to help perpetuate the lies they decided to tell in order to induce the Initial Chinese Victims to each invest $500,000, plus $45,000 in administrative fees.

60.    Gary Chan, individually and on behalf of KRC, also continuously reassured the EB-5 immigration consultants and agents and their clients, including the Initial Chinese Victims, that the State of Ohio was definitely going to guarantee all of the EB-5 investments made by them.   Even when the EB-5 immigration consultants and agents asked for reassurance that the State of Ohio guarantee was in place and was final, Gary Chan, individually and on behalf of KRC, told them unequivocally that it was, and that it was just a matter of government processing before the final approval could be posted online.   One email chain dated August 1-2, 2011, by which Gary Chan, individually and on behalf of KRC, continued to perpetuate that lie, is attached as Ex. "1."   This information was disseminated to EB-5 immigration consultants and agents and their clients, including the Initial Chinese Victims, and was relied upon by Plaintiffs when they invested $500,000 each.

61.     In addition, as evidenced by an email dated Wednesday, July 6, 2011, Gary Chan, individually and on behalf of KRC, provided false and misleading information for inclusion in marketing materials and PowerPoint presentations regarding purported non-EB-5 investment monies, the Initial Chinese Victims were told would make up the remaining financing for the Project.  Ex. "2."  This information was disseminated to EB-5 immigration consultants and agents and their clients, including The Initial Chinese Victims, and was relied upon by Plaintiffs when they invested $500,000 each.

62.     Ohio Defendants' lie that the EB-5 investments would not be the only money used to finance the Project had a huge impact on the Initial Chinese Victims.  This is because the general rule of thumb for immigration consultants and agents is to encourage their clients only to invest in EB-5 projects wherein the EB-5 investments do not exceed 50% of all financing available to the Project.

63.     Terry Chan knew this to be true, and thus he was especially aware of the need to trick the immigration consultants and agents and their clients, including Plaintiffs, on this critical point.  In order to further perpetuate the lie, Terry Chan, individually and on behalf of KRC, induced JPMorgan Chase Bank, N.A. to issue a "letter of interest" acknowledging that the Project would cost some $24,000,000 and stating that Chase was interested in "participating in your project at any level required."  Terry Chan, individually and on behalf of KRC, then took the Chase letter, disseminated it to the immigration consultants and agents and their clients, including the Initial Chinese Victims, and misrepresented that the Chase letter meant that there was already a "guaranteed $20 million" in institutional financing available from JPMorgan Chase Bank, N.A. for the Project.  A copy of the Chase letter is attached as Ex. "3."  The existence of a relationship between Terry Chan and such a prestigious bank as JPMorgan Chase Bank, N.A., a

"famous" bank in the eyes of the Initial Chinese Victims, was an important selling point and helped Ohio Defendants close the fraudulent deals and steal the Initial Chinese Victims' money. This information was disseminated to EB-5 immigration consultants and agents and their clients, including the Initial Chinese Victims, and was relied upon by Plaintiffs when they invested $500,000 each.

64.    Chief among the lies was that every penny of the Initial Chinese Victims' money would be safely deposited and held in an escrow account that would not be touched until the investors' I-562's were approved.  Likewise, the Additional Chinese Victims were promised by the KRC Conspirators that their investments would be under the supervision of Joseph Chen and would not be touched (i.e., would not be spent) without the approval of Joseph Chen, unless and until their I-526's were approved by USCIS.  The reality was that the Conspirators' true intention, from the very beginning, was to put the EB-5 proceeds into an operating account and immediately steal them for their own personal and illegal uses.  The information about the escrow accounts was disseminated to EB-5 immigration consultants and agents and their clients, including the Initial Chinese Victims, and was relied upon by the Initial Chinese Victims when they invested $500,000 each.   The information about their investments being under the supervision of Joseph Chen and not being touched without the approval of Joseph Chen, unless and until their I-526's were approved by USCIS was disseminated to the Additional Chinese Victims and was relied upon by the Additional Chinese Victims when they invested $500,000 each.

65.    Once all of their lies had been constructed and the false and misleading statements had been generated, compiled, gathered and organized into information that was utilized to create the fraudulent marketing materials, PowerPoint and Brochures, Gary Chan, Terry Chan

and Angiulli, individually and on behalf of KRC, began identifying, contacting and communicating with immigration consultants and agents in order to induce them to find unwitting Chinese citizens who wanted to obtain permanent visas in the United States. More specifically, Gary Chan, Terry Chan and Angiulli, individually and on behalf of KRC, began seeking EB-5 investors in China (by and through their immigration consultants and agents) in order to raise funds in China in late 2010.

66.     In China, it is the customary practice for potential EB-5 investors who are looking to relocate out of China to the United States to hire, utilize and rely upon consultants and agents. The immigration consultants and agents act as the potential EB-5 investors' conduits for information provided by EB-5 developers. The potential EB-5 investors then rely on that information when deciding whether to participate in an EB-5 program and, most importantly, which EB-5 program to invest in.

67.     Gary Chan, Terry Chan, Jeffrey Jacobs and Angiulli, individually and on behalf of KRC, knew that, for their scheme to work, they would have to provide their false and misleading marketing materials and Offering Documents, and make their false and misleading statements, to the immigration consultants and agents, with the specific intention that all of that information would be passed along to potential investors, and that the potential investors would rely on it. Gary Chan, Terry Chan, Jeffrey Jacobs and Angiulli, individually and on behalf of KRC, did just that. They provided all of the false and misleading information, and made their false and misleading statements, to the immigration consultants and agents with the specific intent that they pass it along to potential Chinese investors, including Plaintiffs.

68.     Plaintiffs' immigration consultants and agents did exactly what Gary Chan, Terry Chan, Jeffrey Jacobs and Angiulli, individually and on behalf of KRC, intended for them to do –

they did their jobs.  The immigration consultants and agents passed the false and misleading information, including the false and misleading statements, the marketing materials, PowerPoint and Brochures on to the Initial Chinese Victims, who relied on them and invested in Ohio Defendants' fraudulent EB-5 scheme.

69.     None of the immigration consultants or agents knew that the information that was being provided by Gary Chan, Terry Chan, Jeffrey Jacobs and Angiulli, individually and on behalf of KRC was false and misleading.  The immigration consultants and agents believed in, trusted and relied up Gary Chen, Terry Chen, Angiulli and Jeffery Jacobs, individually and on behalf of KRC, who presented themselves and held themselves out as experts in the EB-5 program and very experienced and successful EB-5 developers who were willing, ready and able to obtain permanent visas for Plaintiffs while guaranteeing their investments.  As a result, the immigration consultants and agents told Plaintiffs that they too could believe in, trust and rely upon Gary Chan, Terry Chan, Jeffrey Jacobs and Angiulli, and Plaintiffs did just that, each investing $500,000 in Ohio Defendants' EB-5 program as a result.  Because of the promises made by Gary Chan, Terry Chan, Jeffrey Jacobs and Angiulli, individually and on behalf of KRC, they assumed positions of trust vis-à-vis Plaintiffs and undertook fiduciary duties towards them.

70.     Jiaxi Hu's immigration consultant and agent is Shanghai Donglv.

71.     Mengfang Li's immigration consultant and agent is Austar Group.

72.     Jinxin Li, Mengfang Li's father, also acted as his agent for purposes of gathering information with respect to Ohio Defendants' fraudulent EB-5 program.

73.     Xiaoyan Wu's immigration consultant and agent is Suzhou Overseas.

74.     Wei Ren's immigration consultant and agent is Tangshan Meiao.

75.     Ruimin Chen's immigration consultant and agent is Tangshan Meiao.

76.     Jianli Du's immigration consultant and agent is Shanghai Donglv.

77.     Jimei Zhang's immigration consultant and agent is Shanghai Donglv.

78.     Zhenping Hao's immigration consultant and agent is Beijing Catone Investment Consulting Company ("Beijing Catone").

79.     Jie Cui's immigration consultant and agent is Beijing Catone.

80.     Guiying Wang's immigration consultant and agent is Beijing Catone.

81.     Beijing Catone is also what is known as a "wholesaler" in China.  Simply stated, this means that Beijing Catone identifies and approaches other immigration consultants and agents and informs them of investment opportunities for their respective clients.  Gary Chan, Terry Chan, Angiulli and Jeffrey Jacobs, individually and on behalf of KRC, knew that Beijing Catone was a "wholesaler," and would be a conduit to other immigration consultants and agents throughout China.

82.     Sometime between September and November, 2010, Beijing Catone (through their agent Joseph Chen) was introduced to Gary Chan through Hao Chen.  Gary Chan then reached out to Beijing Catone and asked if Beijing Catone would help Gary Chan to promote the Short Vine Entertainment District project.  Around that time, USCIS' official website announced the approval of numerous regional centers, including KRC's regional center, the Midwest EB-5 Regional Center.

83.     In early November 2010, Joseph Chen traveled to Cincinnati for the first time. Gary Chan and Terry Chan showed him around Cincinnati, showed him the Project and introduced him to Mayor Mark Mallory.  On information and belief, Gary Chan and Terry Chan, individually and on behalf of KRC, induced Mayor Mark Mallory to meet with Joseph Chen, and

later to travel to China to help solicit potential EB-5 investors, to lend additional credence to the false and misleading statements regarding the City of Cincinnati's "support" of the Project as well.

84.     On or about November 24, 2010, Gary Chan and KRC determined the allocation of work among Beijing Catone and KRC.  Beijing Catone would act as the "wholesaler" immigration consultant and agent and would be responsible for the promotion of the Project. KRC would be responsible for all of the legal documents and project information.  Thus, Gary Chan insured that the KRC Conspirators and Non-Party Participants would control what information was disseminated to potential EB-5 investors, and positioned themselves perfectly to make the false and misleading statements that duped them.

85.     Gary Chan, Terry Chan, Jeffrey Jacobs and Angiulli, individually and on behalf of KRC, knew that, for their scheme to work, they would have to provide their false and misleading marketing materials and Offering Documents and make their false and misleading statements to Beijing Catone, with the specific intention that all of that information would be passed along to other immigration consultants and agents throughout China, who would then distribute the same false and misleading information to their clients – the potential EB-5 investors.  The Conspirators' ultimate goal was for the potential EB-5 investors to rely on every word they said.  Gary Chan, Terry Chan, Jeffery Jacobs and Angiulli, individually and on behalf of KRC, thus did in fact provide all of the false and misleading information, and make their false and misleading statements, to Beijing Catone with the specific intent that Beijing Catone pass the information along to other immigration consultants and agents throughout China.

86.     Beijing Catone did exactly what Gary Chan, Terry Chan, Jeffrey Jacobs and Angiulli, individually and on behalf of KRC, intended for it to do.  Beijing Catone passed the

false and misleading information, including the false and misleading statements, on to other immigration consultants and agents throughout China, who relied on them and passed along the fraudulent information to their clients – the potential EB-5 investors, including the Initial Chinese Victims.

87.    Beijing Catone did not know that the information it was being provided by Gary Chan, Terry Chan, Jeffrey Jacobs and Angiulli, individually and on behalf of KRC, was false and misleading.  Beijing Catone believed in, trusted and relied up KRC, Gary Chen, Terry Chen, Angiulli and Jeffery Jacobs who presented themselves and held themselves out as experts in the EB-5 program and very experienced and successful EB-5 developers who were willing, ready and able to obtain permanent visas for Plaintiffs while guaranteeing their investments.  Beijing Catone told other immigration consultants and agents throughout China that they too could believe in, trust and rely upon KRC, Gary Chan, Terry Chan, Jeffrey Jacobs and Angiulli, and the other immigration consultants and agents did just that, passing along the false and misleading information to their clients.

88.    More specifically, Beijing Catone told, among others, Suzhou Overseas, Shanghai Donglv, Austar Group and Tangshan Meiao that they too could believe in, trust and rely upon KRC, Gary Chan, Terry Chan, Jeffrey Jacobs and Angiulli.  Suzhou Oversea, Shanghai Donglv, Austar Group and Tangshan Meiao did just that, passing along the false and misleading information to their clients, including but not limited to the Initial Chinese Victims.  Because the information came from their immigration consultants and agents and the Initial Chinese Victims accepted it as true and relied upon it, they believed in, trusted and relied upon KRC, Gary Chan, Terry Chan, Jeffrey Jacobs and Angiulli.

89.     There is ample evidence of Ohio Defendants preparing their false and misleading statements and marketing materials in preparation for traveling to China and making bogus presentations to Beijing Catone, potential EB-5 investors and other immigration consultants and agents.  The presentations were scheduled to be held in China in: (a) private seminars in Beijing on July 22, 2011; (b) Beijing on July 23, 2011; (c) private seminars in Shanghai on July 24th or 25th, 2011; (d) Suzhou on July 25, 2011 and (e) Chengdu on July 26, 2011, among others.

90.     For example, on Wednesday, July 20, 2011, Terry Chan, individually and on behalf of KRC, sent an email to Joseph Chen, an agent of Beijing Catone, attaching an outline of the talking points/comments that would be made by Angiulli, Jeffrey Jacobs and Terry Chan, individually and on behalf of KRC, during a series of presentations in China.  Those scripted comments included Angiulli saying that the Project was the only project in the United States that had a funds guarantee program – referring to the lie that the State of Ohio would guarantee all EB-5 investments in the Project against loss.  They also included scripted comments by Jeffrey Jacobs lying about non-EB-5 investments of $2.5 million by the City of Cincinnati and $4 million by the Cincinnati Children's Hospital and the University of Cincinnati.  Finally they included scripted lies by Terry Chan regarding the creation of more than enough jobs to support all of the EB-5 I-526's, the guarantee that all funds would be returned through profits earned on the Project or through the State of Ohio government guarantee and the existence of bank funding and other financial support (i.e., non-EB-5 funding) to supplement the EB-5 funding being solicited.  A copy of the Wednesday, July 20, 2011 and attached script of lies is attached as Ex. "4."

91.     In July 2011, Terry Chan also called Joseph Chen to inform him that the State of Ohio, in order to encourage EB-5 investments in the Project, passed a government-guaranteed

investment legislation, and that the legislation had been enacted, only waiting to be signed.  He then sent Joseph Chen what he said were the articles of the legislation.  Gary Chan added the existence of the State of Ohio "government guarantee" to the Brochure, which was ultimately given to Plaintiffs before they invested.  Gary Chan also repeatedly stated that the guarantee had been passed, and that the State of Ohio only had to go through and complete its procedure, but that the guarantee was already in place and the EB-5 investors' money was 100% safe.

92.     Gary Chan was also responsible for deciding the content of any comments he made to the immigration consultants and agents, as well as to potential EB-5 investors, including the Initial Chinese Victims.  In an email dated Monday August 8, 2011 the comments prepared by Gary Chan were circulated by Violette Zhang who was Gary Chan's assistant to among others, Beijing Catone.  The comments scripted by Gary Chan included the following false and misleading statements:

(a)     To ensure the project runs smoothly, the state government is enacting tax credit legislation that will ensure the project can return all funds to investors.  This is the only project that has a state guarantee.

(b)     …the city has already begun a $2.5 million streetscape project in order to make this one of the city's most beautiful streets.  The city is also providing $3 million in matching tax credits funds to the project.

(c)     Both the University and the Hospital support this project.  The University has invested $1 million and Cincinnati Children's Hospital has invested $5 million into the project.

(d)     First, the most important part of this project is that we have direct control over job creation because we also own the restaurants (they didn't own the restaurants), so we can hire more people to create enough jobs to make sure we get the green card for everyone.

(e)     A recent economic impact study showed that the Short Vine Entertainment District project will create 581 jobs.

A copy of the email dated Monday August 8, 2011 is attached as Ex. "5."

93.     Once all of the deceitful marketing materials, including the Brochures, the PowerPoint and the talking points were perfected, it was time for the "fraud show" to hit the road.  So, at different times Gary Chan, Terry Chan, Angiulli and Jeffrey Jacobs, individually and on behalf of KRC, paid for the thousands of copies of the targeted fraudulent marketing materials they had so painstakingly created and traveled to China to start to cast their bait, trolling for potential EB-5 investors they could lure into their web of fraud.

94.     There was one "fraud show" in particular during which Defendant' fraudulent scheme landed a huge haul, one that eventually culminated in their getting their hands on Plaintiffs' $5,000,000.

95.     On November 13, 2010, Gary Chan and Terry Chan individually and on behalf of KRC, put on a "fraud show" in a space provided by Austar in China.  There was a representative of Beijing Catone, Joseph Chen, at this presentation.

96.     During this presentation Gary Chan, individually and on behalf of KRC, represented that to ensure that the Project would run smoothly, The State of Ohio enacted credit legislation that would guarantee that the Project could return all funds to investors.  He also represented that the Project was the only Project in the United States that had such a state guarantee.  He went on to reiterate that the University of Cincinnati and the Cincinnati Children's Hospital had invested millions of dollars into the Project.  Further, he represented that the Project would create 581 EB-5 jobs.  Moreover, he represented that any potential investor who paid their $500,000 investment into the EB-5 program would have all of their funds returned through retail profits, real estate profits and sale of companies, though at the same time, he repeated that the Project was the first project guaranteed by government funds.  Next, he represented that JP Morgan Chase Bank, N.A. was the Project's "banking partner" and "will finance our project" to

guarantee the Project would be completed smoothly.    Finally, he represented that "other economic and social organizations" had invested $16 million for the Project.    All of the representations made by Gary Chan were false and misleading when they were made.

97.    All of the false and misleading representations made by Gary Chan, individually and on behalf of KRC, were relied upon by Beijing Catone.  All of the false and misleading representations made by Gary Chan, individually and on behalf of KRC, to Beijing Catone were communicated to Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao.

98.    All of the false and misleading representations made by Gary Chan, individually and on behalf of KRC, were relied upon by Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao.

99.    All of the false and misleading representations made by Gary Chan, individually and on behalf of KRC, were communicated by Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao to their respective clients, including the Initial Chinese Victims.

100.    All of the false and misleading representations made by Gary Chan, individually and on behalf of KRC, were relied upon by the Initial Chinese Victims when they were fraudulently induced into signing the Offering Documents they were required to sign as a pre-condition of investing in the Project.  All of the false and misleading representations made by Gary Chan were relied upon by the Initial Chinese Victims when they each invested the $500,000 in the EB-5 program and the $45,000 in administrative fees.

101.    During the presentations they made throughout China, Terry Chan, Angiulli and Jeffery Jacobs, individually and on behalf of KRC, used talking points to help guide them through their scripted remarks.  A copy of the talking points is attached as Ex. "6."

102.    During their presentations throughout China, Gary Chan, Terry Chan, Angiulli and Jeffery Jacobs, individually and on behalf of KRC, also used the PowerPoint, which supported, reiterated and incorporated some of the false and misleading statements that were made orally.  Those false and misleading statements included: (a) Short Vine Entertainment District will be the first project in the US guaranteed by the state fund; (b) Financial support from Cincinnati government; (c) Support from University of Cincinnati; (d) Support from Cincinnati Children's Hospital; (d) Creation of job opportunities is secured; (e) No risk for Returning of Fund; and (f) Financial Support from banks and other organizations.  A copy of the PowerPoint (in Chinese with a supplied English translation) is attached as Ex. "7."  At the time the PowerPoint was used and the PowerPoint presentations were made, the Conspirators knew they were untruthful and had no intention to fulfill the promised made to induce the potential investors to invest their money in the EB-5 program and the Project.

103.    All of the false and misleading representations contained in the PowerPoint were relied upon by Beijing Catone.  All of the false and misleading representations contained in the PowerPoint to Beijing Catone were communicated to Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao.

104.    All of the false and misleading representations contained in the Power Point were relied upon by Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao.

105.    All of the false and misleading representations contained in the PowerPoint were communicated by Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao to their respective clients, including the Initial Chinese Victims.

106.    All of the false and misleading representations contained in the PowerPoint were relied upon by the Initial Chinese Victims when they were fraudulently induced into signing the

Offering Documents they were required to sign as a pre-condition of investing in the Project.  All of the false and misleading representations made in the PowerPoint were relied upon by Plaintiffs when they each invested the $500,000 in the EB-5 program and the $45,000 in administrative fees.

107.    While the false and misleading statements were contained in the PowerPoint, the PowerPoint presentation was put on, at various times by the groups comprised of Gary Chan, Terry Chan, Jeffrey Jacobs and Angiulli (in various combinations), individually and on behalf of KRC.  As such, they were adopted by all of the participants in the "fraud shows" as if each of them disseminated the information in the PowerPoint themselves.

108.    During their presentation throughout China, Gary Chan, Terry Chan, Angiulli and Jeffery Jacobs, individually and on behalf of KRC, brought the Brochures with them to distribute to immigration consultants and agents and their clients, other potential EB-5 investors and any other attendees.  On information and belief, Gary Chan, Terry Chan, Angiulli and Jeffery Jacobs, individually and on behalf of KRC, physically handed the Brochures to immigration consultants and agents and their clients, other potential EB-5 investors and any other attendees who asked for them.  In addition, Gary Chan, Terry Chan, Angiulli and Jeffery Jacobs, individually and on behalf of KRC, passed around the Brochures to immigration consultants and agents and their clients, other potential EB-5 investors and any other attendees in the crowd.  Finally, on information and belief, they also created stacks of Brochures for the immigration consultants and agents and their clients, other potential EB-5 investors and any other attendees to take with them at their leisure and take with them to pass along to other potential EB-5 investors.  The goal of Gary Chan, Terry Chan, Angiulli and Jeffery Jacobs, individually and on behalf of KRC, was to disseminate the false and misleading information contained in the Brochures as widely as

possible throughout China.  In fact, the Brochures were distributed at every meeting attended by Gary Chan, Terry Chan, Angiulli and Jeffery Jacobs (in varying combinations) throughout China.  A copy of the Brochure, in Chinese, is attached as Ex. "8."  A copy of the Brochure, translated to English, is attached as Ex. "9."  There are various false and misleading statements in the Brochure.

109.    On Page 8 of the Brochure – Short Vine Entertainment District – it says that the Project will cost $42.4 million, with 40 EB-5 investors (which means that the EB-5 investors would contribute $20 million dollars – less than 50% of Project financing).  It also says that the Project would include office sites for some science and technology development companies. These statements were false and misleading when made because there was no non-EB-5 financing in place and there never would be.  In addition, the regional center was not authorized to do business as a science and technology company, because such uses were beyond the scope of the approved uses of the regional center, a fact well known to the Conspirators since they chose which uses to include when seeking approval of the regional center.

110.    On Page 11 of the Brochure – Support from Bank – it says "Now, two banks, JPMorgan Chase and Bank of Kentucky, agreed to cooperate with the Project for refinancing. Then it says that JP Morgan Chase has already confirmed to offer a loan, with a maximum of $20 million available, to the Project to insure its successful completion.  With such guarantee, the Project will be completed no matter how many investors will join in.  These statements were false and misleading because, on information and belief, neither JPMorgan Chase nor Bank of Kentucky agreed to refinance the Project.  More importantly, JPMorgan Chase never guaranteed to make up to a $20 million loan available for the Project.

111.    On Page 12 of the Brochure - Support from Bank – the Conspirators further mislead the immigration consultants and agents and their clients, other potential EB-5 investors and other attendees by including a letter in the Brochure and representing to everybody that it is proof that JPMorgan Chase had "guaranteed" a $20 million loan to the Project.  Considering that the letter is in English and the description of the letter, in Chinese, says that the letter is in the form of a "guarantee," there is little wonder why potential EB-5 investors, including the Initial Chinese Victims, were misled.

112.    On Page 13 of the Brochure – Government Support – it says the government will directly invest government tax revenue fund of $3.5 million to the Project of which $2.5 million was approved to be used for improvement of streetscape of living quarters and $1 million be used for reconstruction of the appearance of living quarters.  It goes on to say, "[b]esides, secured by government tax revenue fund, Government of Ohio State guaranteed that the investors' investment funds will be fully returned after five years, thus the profit of the investors will be maximally protected.  This is the only EB-5 project in the United States of America secured by government fund."  Each of these statements were false and misleading when they were made.

113.    On Page 13 of the Brochure – Government Support – the KRC Conspirators and Non-Party Participants further mislead immigration consultants and agents and their clients, other potential EB-5 investors and other attendees by including a letter and an excerpt from a piece of legislation in the Brochure and representing to everybody that it was proof that the State of Ohio had guaranteed the payment of all of EB-5 investors' money back if the Project was not successful. The Conspirators specifically represented to all potential EB-5 investors, including the Initial Chinese Victims, that their $500,000 investments were 100% safe and guaranteed by

the State of Ohio.  While the documents the Conspirators included to dupe potential EB-5 investors were in Chinese, the English translations make clear that the Chinese explanations of the documents were lies.

114.    On Page 14 of the Brochure – Project Funding Plan – the Conspirators include a chart that purports to demonstrate where all of the money for the Project is coming from.  By including this chart, the Conspirators directly misled immigration consultants and agents and their clients, other potential EB-5 investors and other attendees.  This chart says that there will be $42.5 million in financing for the Project, with $20 million coming from EB-5 investors, $6.5 million coming from "government supports" and $16 million coming from "other economic and social organizations investments."  It goes on to list the "other economic and social organizations" as Cincinnati Children's Hospital Medical Center, Fund of Commonwealth Bank of Australia, Ohio Third Frontier, Cincinnati Science Fund, etc.  These statements were false and misleading when made, because no non-EB-5 funds were raised.  There were not "government supports" of $6.5 million at the time of the presentation or at any time.  There were not "economic and social organization investments" of $16 million at the time of the presentation or ever.

115.    A copy of the Brochure was provided by Gary Chan, Terry Chan, Angiulli and Jeffery Jacobs, individually and on behalf of KRC, to Beijing Catone at the presentation. All of the false and misleading representations contained in the Brochure were relied upon by Beijing Catone.  All of the false and misleading representations contained in the Brochure that was provided to Beijing Catone were communicated to Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao.  In fact, Beijing Catone gave copies of the Brochure to Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao.  At the time the Brochures

were distributed, the Conspirators knew they were untruthful and had no intention to fulfill the promised made to induce the potential investors to invest their money in the EB-5 program and the Project.

116.    All of the false and misleading representations contained in the Brochure were relied upon by Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao.

117.    All of the false and misleading representations contained in the Brochure were communicated by Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao to their respective clients, including the Initial Chinese Victims.   In fact, Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao gave copies of the Brochure to their clients, including the Initial Chinese Victims, with the exception of Mengfang Li, who got it from his father Jinxin Li (who got it directly from the KRC Conspirators and Non-Party Participants).

118.    All of the false and misleading representations contained in the Brochure were relied upon by the Initial Chinese Victims when they were fraudulently induced into signing the offering documents they were required to sign as a pre-condition of investing in the Project.   All of the false and misleading representations made in the Brochure presentation were relied upon by the Initial Chinese Victims when they each invested the $500,000 in the EB-5 program and the $45,000 in administrative fees.

119.    While the false and misleading statements were contained in the Brochure, Gary Chan, Terry Chan, Angiulli and Jeffery Jacobs, individually and on behalf of KRC, on information and belief: (a) brought Brochures with them to distribute to immigration consultants and agents and their clients, other potential EB-5 investors and any other attendees; (b) on information and belief, physically handed the Brochures to immigration consultants and agents

and their clients, other potential EB-5 investors and any other attendees who asked for them; (c) passed around the Brochures to immigration consultants and agents and their clients, other potential EB-5 investors and any other attendees in the crowd; and (d) created stacks of Brochures for the immigration consultants and agents and their clients, other potential EB-5 investors and any other attendees to take at their leisure, and take with them to pass along to other potential EB-5 investors.  To be sure, the goal of Gary Chan, Terry Chan, Angiulli and Jeffery Jacobs, individually and on behalf of KRC, was to disseminate the false and misleading information contained in the Brochures as widely as possible throughout China.  As such, the contents of the Brochures were adopted by all of the participants in the "fraud show" as if each of them disseminated the information in the Brochures themselves

120.    On July 23, 2011, Jinxin Li, the father of Plaintiff, Mengfang Li, attended a promotional conference sponsored by KRC at Hong Kong and Macao Center, No.2 Chao Yang Men Bei DA Jie, Beijing, 100027, China, at which Terry Chan, Angiulli and Jeffery Jacobs, individually and on behalf of KRC, each made a speech.

121.    During this presentation, Angiulli, individually and on behalf of KRC, represented that the Project was the only project in the United States that was being guaranteed by the government.  He also represented that the State of Ohio was guaranteeing that any EB-5 investor who invested in the Project would get their money back.  Finally, he represented that because of the State of Ohio's guarantee, no EB-5 investor who invested in the Project would ever lose their money.  All of the representations made by Angiulli, individually and on behalf of KRC, were false and misleading when they were made.

122.    All of the false and misleading representations made by Angiulli, individually and on behalf of KRC, were relied upon by Beijing Catone.  All of the false and misleading

representations made by Angiulli to Beijing Catone were communicated to Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao.

123.    All of the false and misleading representations made by Angiulli, individually and on behalf of KRC, were relied upon by Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao.

124.    All of the false and misleading representations made by Angiulli, individually and on behalf of KRC, were communicated by Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao to their respective clients, including the Initial Chinese Victims.

125.    All of the false and misleading representations made by Angiulli were relied upon by the Initial Chinese Victims when they were fraudulently induced into signing the offering documents they were required to sign as a pre-condition of investing in the Project.  All of the false and misleading representations made by Angiulli were relied upon by Plaintiffs when they each invested the $500,000 in the EB-5 program and the $45,000 in administrative fees.

126.    While Angiulli spoke the false and misleading statements set forth above, they were presented by the group comprised of Gary Chan, Terry Chan, Jeffrey Jacobs and Angiulli, individually and on behalf of KRC.  As such, they were adopted by all of the participants in the "fraud show" as if each of them spoke the same words.

127.    During this same presentation, Jeffrey Jacobs, individually and on behalf of KRC, represented that the City of Cincinnati was providing $2.5 million to the Project.  He also represented that the Cincinnati Children's Hospital and the University of Cincinnati were providing $4 million to the Project.  All of the representations made by Jeffrey Jacobs were false and misleading when they were made.

128.   All of the false and misleading representations made by Jeffery Jacobs, individually and on behalf of KRC, were relied upon by Beijing Catone.  All of the false and misleading representations made by Jeffery Jacobs, individually and on behalf of KRC, to Beijing Catone were communicated to Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao.

129.   All of the false and misleading representations made by Jeffery Jacobs, individually and on behalf of KRC, were relied upon by Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao.

130.   All of the false and misleading representations made by Jeffery Jacobs, individually and on behalf of KRC, were communicated by Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao to their respective clients, including the Initial Chinese Victims.

131.   All of the false and misleading representations made by Jeffery Jacobs, individually and on behalf of KRC, were relied upon by the Initial Chinese Victims when they were fraudulently induced into signing the Offering Documents they were required to sign as a pre-condition of investing in the Project.  All of the false and misleading representations made by Jeffery Jacobs, individually and on behalf of KRC, were relied upon by the Initial Chinese Victims when they each invested the $500,000 in the EB-5 program and the $45,000 in administrative fees.

132.   While Jeffery Jacobs spoke the false and misleading statements set forth above, they were presented by the group comprised of Gary Chan, Terry Chan, Jeffrey Jacobs and Angiulli, individually and on behalf of KRC.  As such, they were adopted by all of the participants in the "fraud show" as if each of them spoke the same words.

133.     During this same presentation on Terry Chan, individually and on behalf of KRC, represented that there would be no problems with respect to the return of funds to any EB-5 investor, both because of the profits that the Project would generate (through operations and investments in tech companies) and because of the guarantee by the State of Ohio that any EB-5 investor who lost money would be paid back.  He also represented that bank financing as well as other non-EB-5 financial support had already been obtained for the Project.   All of the representations made by Terry Chan were false and misleading when they were made.

134.     All of the false and misleading representations made by Terry Chan, individually and on behalf of KRC, were relied upon by Beijing Catone.  All of the false and misleading representations made by Terry Chan, individually and on behalf of KRC, to Beijing Catone were communicated to Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao.

135.     All of the false and misleading representations made by Terry Chan, individually and on behalf of KRC, were relied upon by Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao.

136.     All of the false and misleading representations made by Terry Chan, individually and on behalf of KRC, were communicated by Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao to their respective clients, including the Initial Chinese Victims.

137.     All of the false and misleading representations made by Terry Chan, individually and on behalf of KRC, were relied upon by the Initial Chinese Victims when they were fraudulently induced into signing the Offering Documents they were required to sign as a pre-condition of investing in the Project.  All of the false and misleading representations made by Terry Chan, individually and on behalf of KRC, were relied upon by the Initial Chinese Victims

when they each invested the $500,000 in the EB-5 program and the $45,000 in administrative fees.

138.    While Terry Chan spoke the false and misleading statements set forth above, they were presented by the group comprised of Gary Chan, Terry Chan, Jeffrey Jacobs and Angiulli, individually and on behalf of KRC.  As such, they were adopted by all of the participants in the "fraud show" as if each of them spoke the same words.

139.    Throughout this meeting on July 23, 2011, Gary Chan passed out the Brochures, containing numerous false and misleading statements, to immigration consultants and agents and their clients, other potential EB-5 investors and any attendees who wanted them.

140.    The Angiulli, Jeffery Jacobs and Terry Chan speeches discussed above were repeated by Angiulli, Jeffery Jacobs and Terry Chan, using the same scripts, PowerPoint and Brochures, throughout China, during a series of fraud shows during July and August 2011.

141.    There is abundant documentation of the repeated promises made to the Initial Chinese Victims that every penny of the $500,000 they each invested in the Project would be held in escrow unless and until their I-526 petition was approved.  For example, in an email dated July 27, 2011 from Gary Chan to Monica Yang, Joseph Chen's assistant at Beijing Catone, in which Terry Chan, among others, was copied, Gary says "NEC Financial will provide all of the **escrow** and transfer instructions by tomorrow." (Emphasis added).  A copy of the July 27, 2011 email is attached as Ex. "10."  The immigration consultants and agents were not familiar with what escrow accounts were or how they worked, but they did understand the Conspirators' explanations that Plaintiffs' money would be supervised by someone who would make sure that their $500,000 each would not be used unless and until their I-526's were approved by USCIS. So, in the minds of the immigration consultants and agents, as well in the minds of their clients,

including the Initial Chinese Victims, all that was meant by an "escrow account" was that the Initial Chinese Victims' EB-5 investment money would be safe and untouched until such time as their I-526 applications were approved.   Because of the Initial Chinese Victims' complete reliance on the Conspirators with respect to what an escrow account was and how it worked, the Conspirators owed a fiduciary duty to Plaintiffs to insure that their money was safe and untouched until such time as their I-526 petitions were approved by USCIS.

142.   In another email dated August 3, 2011 entitled "Escrow agreement translated" from Gary Chan to Monica Yang in which Joseph Chen and Terry Chan, among others, were copied.   Pursuant to that email, Gary Chan was purporting to send a Subscription and Processing Fee Escrow Agreement to the immigration consultants and agents and their clients, including the Initial Chinese Victims, translated into Chinese, explaining the escrow account(s) into which Plaintiffs' investments were supposed to be deposited until their I-526 petitions were approved. Of course, the lies about escrow accounts proved to be untrue, as the Initial Chinese Victims' investment money was never deposited into an escrow account and was instead stolen.   A copy of the August 3, 2011 email is attached as Ex. "11."

143.   During the July 23, 2011 promotional conference attended by Jinxin Li, Gary Chan participated in the distribution of the Brochure, and Jinxin Li received a copy.   Jinxin Li discusses the July 23, 2011 promotional conference, the comments made by Terry Chan, Angiulli, and Jeffery Jacobs, individually and on behalf of KRC, as well as the representations made by Gary Chan when he distributed the Brochure in his Affidavit of Jinxin Li.   A copy of the Affidavit of Jinxin Li (in Chinese with English translation) is attached as Ex. "12."

144.     Jinxin Li relied upon the false and misleading statements made by Terry Chan, Angiulli and Jeffery Jacobs, individually and on behalf of KRC, when he recommended to his son, Mengfang Li, that he consider investing in an EB-5 project, and specifically in the Project.

145.     Jinxin Li relied upon the false and misleading statements contained in the PowerPoint when he recommended to his son, Mengfang Li, that he consider investing in an EB-5 project, and specifically in the Project.

146.     Jinxin Li relied upon the false and misleading statements in the brochure when he recommended to his son, Mengfang Li, that he consider investing in an EB-5 project, and specifically in the Project.

147.     All of the false and misleading representations made by Terry Chan, Angiulli and Jeffery Jacobs, individually and on behalf of KRC, the false and misleading statements contained in the PowerPoint, together with the false and misleading statements included in the Brochure were relied upon by Mengfang Li when he was fraudulently induced into signing the Offering Documents he was required to sign as a pre-condition of investing in the Project. All of the false and misleading representations made by Terry Chan, Angiulli and Jeffery Jacobs, individually and on behalf of KRC, the false and misleading statements contained in the PowerPoint presentation, together with the false and misleading statements included in the brochure were relied upon by Mengfang Li when he invested the $500,000 in the EB-5 program and the $45,000 in administrative fees.

148.     While Terry Chan, Angiulli and Jeffery Jacobs, individually and on behalf of KRC, spoke the false and misleading statements at the July 23, 2011 promotional conference, as set forth in above, they were presented by the group comprised of Gary Chan, Terry Chan,

Jeffrey Jacobs and Angiulli, individually and on behalf of KRC. As such, they were adopted by all of the participants in the promotional conference as if each of them spoke the same words.

149.    Gary Chan, followed-up with many of the immigration consultants and agents in order to reinforce the many false and misleading statements that had been repeatedly made by him, Terry Chan, Angiulli and Jeff Jacobs, individually and on behalf of KRC and try to close some deals with potential EB-5 investors, including the Initial Chinese Victims. For example, Gary Chan contacted Austar (immigration consultant and agent for Plaintiff Li Mengfang, Jinxin Li's son) and Shanghai Donglv (immigration consultant and agent for Plaintiffs Hu Jiaxi, Du Jianli and Zhang Jimei) as well as Beijing Catone (immigration consultant and agent for Plaintiffs Cui Jie, Hao Zhenping and Wang Guiying) as set forth in an email from Gary Chan to Joseph Chen dated Wednesday, February 9, 2011, a copy of which is attached hereto as Ex. "13."

150.    Gary Chan also began sending Offering Documents to immigration consultants and agents for them to review and send along to potential EB-5 investors, as demonstrated in and email from Gary Chan to George Sun at Austar Group (cc: Joseph Chen) dated February 12, 2011, a copy of which is attached as Ex. "14." Beijing Catone is copied because Beijing Catone is the "wholesaler" who acted as a conduit to all of the other immigration consultants and agents and was unwittingly used by Gary Chan, Terry Chan, Angiulli and Jeffery Jacobs, individually and on behalf of KRC to send the false and misleading information to, among others, Suzhou Overseas, Shanghai Donglv, Austar Group and Tangsham Meiao.

151.    In addition, the Conspirators duped Beijing Catone into identifying the Additional Chinese Victims as additional EB-5 investors by, among other things, lying to Joseph Chen by promising him that the Additional Chinese Investors' EB-5 investment monies would be under his supervision and would not be spent unless and until the Additional Chinese Victims I-526's

were approved by USCIS.   To the contrary, however, Ohio Defendants went behind Joseph Chen's back and stole the Additional Chinese Victims' money without his or Beijing Catone's consent.

152.    Gary Chan also met personally with some of the immigration consultants and agents in order to facilitate the process of closing as many deals as possible with potential EB-5 investors, including the Initial Chinese Victims.   Having invested so much time, money and effort in helping to create the fraudulent scheme, he wanted to make sure that none of the targets got off the hook, and every potential victim was scammed out of their $500,000, plus $45,000 in administrative fees.   One such personal visit by Gary Chan with the immigration consultant and agent of a potential victim is memorialized in an email from Gary Chan to George Sun dated February 14, 2011 (setting up a meeting on February 15, 2011), a copy of which is attached as Ex. "15."

153.    Once Gary Chan, Terry Chan, Angiulli and Jeffery Jacobs, individually and on behalf of KRC, had inundated the immigration consultants and agents with their false and misleading statements, false and misleading PowerPoint and false and misleading Brochures, and had induced the immigration consultants and agents to disseminate the universe of false and misleading information to their clients, including the Initial Chinese Victims, and indeed throughout China, it was time for them to try to start to harvest the fruits of their fraudulent scheme.   In order to do this, they began circulating Offering Documents in hopes of closing deals and getting $500,000 in EB-5 investment monies and $45,000 in administrative fees from as many potential investors as possible, including the Initial Chinese Investors.

154.    Towards that end, on or about September 15, 2010, the Fund issued a Private Placement Memorandum on behalf of the Fund which offered "eligible investors up to 40 units

of limited partnership interests (the "Units") for $500,000 per Unit, plus an additional $45,000 administration fee per Unit, which fee was to be paid by the Fund to the Fund's general partner." At that time, the general partner of the Fund was KRC. The PPM was later amended on November 15, 2010 (the "PPM"), and the PPM that was incorporated into the subscription agreements signed by the Initial Chinese Victims and the Additional Chinese Victims (except Guiying Wang, who signed the May 22, 2015 version of the PPM) (each a "Subscription Agreement" and collectively the "Subscription Agreements").  A copy of the PPM is attached here to as Ex. "16."  The May 22, 2015 version of the PPM signed by Guiying Wang has been lost and therefore cannot be attached.  Plaintiffs reserve the right to attach it once it is produced in discovery.  Nevertheless, Mr. Wang was assured that his EB-5 investment money would not be spent unless and until his I-526 was approved by the USCIS.

155.    In the Escrow and Use of Subscription Payments Section of the PPM it states:

> Pending USCIS's decision on the prospective investor's I-526 Petition, the subscription payment will be **held in an escrow account**. If the USCIS approves the prospective investor's I-526 Petition, the Fund will close on the prospective investor's subscription agreement, subject to the general discretion of the GP to reject subscriptions. The subscription payment will then be applied as the prospective investor's capital contribution, and the subscription payment in the **escrow account** will be released to the Fund for the Fund's use consistent with the then applicable EB-5 Program Requirements. **If the USCIS denies the prospective investor's I-526 Petition, the subscription payment will be released from the escrow account** and returned to the prospective investor, who will be released from his or her obligation to purchase the Unit. (Emphasis added).

This provision of the PPM was false and misleading at the time it was made because the Conspirators never intended to establish or utilize escrow accounts for the Initial Chinese Victims and the Additional Chinese Victims' (except Guiying Wang, who signed the May 22, 2015 version of the PPM) investment monies, and never intended to leave those monies in escrow accounts pending approval of their I-526's.  Instead, the Conspirators at all times

intended to line their own pockets and finance lifestyles beyond their means, taking money that they did not earn and diverting it from its proper use – creating jobs under the EB-5 program. The Conspirators also intended to distribute Plaintiffs' EB-5 investment monies to Jacquelyn Chan and certain Non-Party Participants as a reward and to compensate them for aiding and abetting their fraud and participating in their conspiracy.  Jacquelyn Chan and certain Non-Party Participants always intended to take Plaintiffs' EB-5 investment monies as a reward and compensation for aiding and abetting the Conspirators in their fraud and participating in their conspiracy.

156.    In the SUMMARY  Section of the PPM under the Closing heading it says:

> For investors who are applying for approval of an I-526 Petition through the EB-5 Program, their subscription payment will be **held in escrow account**.  If the USCIS approves the investor's I-526 Petition, the Fund will close on the prospective investor's subscription agreement.  **If the USCIS denies the investor's I-526 Petition, the subscription payment will be released from the escrow account and returned to the investor**, who will be released form his or her obligation to purchase the Unit.  (Emphasis added).

This provision of the PPM was false and misleading at the time it was made because the Conspirators never intended to establish or utilize escrow accounts for Plaintiffs' investment monies, and never intended to leave those monies in escrow accounts pending approval of their I-526 applications.  Instead, the Conspirators at all times intended to line their own pockets and finance lifestyles beyond their means, taking money that they did not earn and diverting it from its proper use – creating jobs under the EB-5 program.

157.    In the SUMMARY Section of the PPM under the Allocations and Distributions; Investment Strategy heading it says:

> Furthermore, a tenant of the Project is anticipated to be an early-stage technology company ("TechCo").  InvestCo anticipates making an investment in TechCo in the form of a convertible note or equity.  InvestCo anticipates that the terms of any investment in TechCo will provide that InvestCo will share in the proceeds of

a sale of TechCo.  As and when InvestCo receives distributions of funds from TechCo, whether through liquidation or otherwise, InvestCo will return such funds to its investors; the funds therefrom received by the Fund will be distributed to its Partners.

This provision of the PPM was false and misleading when it was made because the Conspirators knew that the regional center was not approved to conduct the business of an investor in early-stage technology companies, such that Plaintiffs' EB-5 investments were prohibited from being invested in early-stage technology companies.  The Conspirators failed to disclose that the regional center was prohibited from conducting such business but still used the possibility of profits from the purported early-stage technology companies to induce Plaintiffs to make EB-5 investments.  To make matters worse, after Ohio Defendants stole Plaintiffs' EB-5 investment money, Terry Chan used some of the stolen money to invest in early-stage tech companies called The Source, Zipscene and Wearcast.  On information and belief, Terry Chan has or had an ownership interest in The Source, but failed to disclose that fact to Plaintiffs.

158.    In the GENERAL PARTNER section of the PPM it states that "[t]he GP will have sole and absolute authority to invest, hold, sell or exchange Fund assets and properties, provided that the GP shall use its best efforts to cause the Fund to operate in accordance with the then applicable EB-5 Program requirements."  This statement was false and misleading when made because by this time the Conspirators had already concocted and put their fraudulent scheme into motion and planned to abscond with Plaintiffs' money the moment they got their hands on it, which is exactly what they did.  Stealing Plaintiffs' money without ever putting it into escrow clearly was not "in accordance with the then applicable EB-5 Program requirements." The Conspirators also intended to distribute Plaintiffs' EB-5 investment monies to Jacquelyn Chan and certain Non-Party Participants as a reward and to compensate them for aiding and abetting

them in their fraud and participating in their conspiracy.  Jacquelyn Chan and certain Non-Party Participants always intended to take Plaintiffs' EB-5 investment monies as a reward and compensation for aiding and abetting the Conspirators in their fraud and participating in their conspiracy.

159.   The Conspirators clearly created a fiduciary duty towards Plaintiffs as a result of the PPM when in Paragraph 8 on Page 13 they warned – "All decisions with respect to the management of the Fund will be made exclusively by the GP.  The partners have no right or power to take part in the management or control of the business of the fund.  Accordingly, no person should purchase any of the Units offered **unless he or she is willing to entrust all aspects of the Fund to the GP**." (Emphasis added).  Unfortunately for Plaintiffs, they did entrust all aspects of the Fund to the GP, which in reality meant Gary Chan and Terry Chan, and that was a $5,000,000 mistake.

**Plaintiffs are Fraudulently Induced to Invest in the Short Vine Entertainment District EB-5 Offering**

160.   In reliance on the false and misleading statements made during the fraud shows and/or the promotional conference, the PowerPoint, and in the Brochures, each of the Initial Chinese Victims and the Additional Chinese Victims (with the exception of Guiying Wang, who signed the May 22, 2015 version of the PPM) accepted the terms of and agreed to be bound by the Offering Documents.

161.   On August 31, 2011, plaintiff Jiaxi Hu, in reliance on the false and misleading statements made during the fraud shows, the PowerPoint, and in the Brochures entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee.  A copy of Mr. Hu's Subscription Agreement is attached hereto as Ex. "17."

162.    Mr. Hu funded his investment in the Fund on October 6, 2011. Under the PPM, incorporated into the Subscription Agreement, Mr. Hu's investment proceeds were to be held in an escrow account and not disbursed by KRC or its principals, Gary Chan or Terry Chan, until after USCIS approved Mr. Hu's I-526.   However, the Conspirators stole Mr. Hu's EB-5 investment proceeds before USCIS approved his I-526 application and used them for their own personal benefit as well for the benefit of Jacquelyn Chan and certain Non-Party Participants, preventing those proceeds from being used for their intended purpose – the creation of jobs under the EB-5 program.   The Conspirators also intended to distribute Plaintiffs' EB-5 investment monies to Jacquelyn Chan and certain Non-Party Participants as a reward and to compensate them for aiding and abetting their fraud and participating in their conspiracy. Jacquelyn Chan and certain Non-Party Participants always intended to take Plaintiffs' EB-5 investment monies as a reward and compensation for aiding and abetting the Conspirators in their fraud and participating in their conspiracy.

163.    On October 26, 2011, plaintiff Mengfang Li entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee.  A copy of Mr. Li's Subscription Agreement is attached as Ex. "18."

164.    Mr. Li funded his investment in the Fund on November 3, 2011.  Under the PPM, incorporated into the Subscription Agreement, Mr. Li's investment proceeds were to be held in an escrow account and not disbursed by KRC or its principals, Gary Chan or Terry Chan, until after USCIS approved Mr. Li's I-526 application.  However the Conspirators stole Mr. Li's EB-5 investment proceeds before USCIS approved his I-526 and used them for their own personal benefit as well for the benefit of Jacquelyn Chan and certain Non-Party Participants, preventing those proceeds from being used for their intended purpose – the creation of jobs under the EB-5

program. The Conspirators also intended to distribute Plaintiffs' EB-5 investment monies to Jacquelyn Chan and certain Non-Party Participants as a reward and to compensate them for aiding and abetting their fraud and participating in their conspiracy. Jacquelyn Chan and certain Non-Party Participants always intended to take Plaintiffs' EB-5 investment monies as a reward and compensation for aiding and abetting the Conspirators in their fraud and participating in their conspiracy.

165.   On October 20, 2011, plaintiff Xiaoyan Wu entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee. A copy of Ms. Wu's Subscription Agreement is attached hereto as Ex. "19."

166.   Ms. Wu funded her investment in the Fund on November 3, 2011. Under the PPM, incorporated into the Subscription Agreement, Ms. Wu's investment proceeds were to be held in an escrow account and not disbursed by KRC or its principals, Gary Chan or Terry Chan, until after USCIS approved Ms. Wu's I-526 application. However, the Conspirators stole Ms. Wu's EB-5 investment proceeds before USCIS approved her I-526 and used them for their own personal benefit as well for the benefit of Jacquelyn Chan and certain Non-Party Participants, preventing those proceeds from being used for their intended purpose – the creation of jobs under the EB-5 program. The Conspirators also intended to distribute Plaintiffs' EB-5 investment monies to Jacquelyn Chan and certain Non-Party Participants as a reward and to compensate them for aiding and abetting their fraud and participating in their conspiracy. Jacquelyn Chan and certain Non-Party Participants always intended to take Plaintiffs' EB-5 investment monies as a reward and compensation for aiding and abetting the Conspirators in their fraud and participating in their conspiracy.

167.    On July 25, 2011, plaintiff Wei Ren entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee. A copy of Mr. Ren's Subscription Agreement is attached hereto as Ex. "20."

168.    Mr. Ren funded his investment in the Fund on November 21, 2011. Under the PPM, incorporated into the Subscription Agreement, Mr. Ren's investment proceeds were to be held in an escrow account and not disbursed by KRC or its principals, Gary Chan or Terry Chan, until after USCIS approved Mr. Ren's I-526 application.  However, the Conspirators stole Mr. Ren's EB-5 investment proceeds before USCIS approved his I-526 and used them for their own personal benefit as well for the benefit of Jacquelyn Chan and certain Non-Party Participants, preventing those proceeds from being used for their intended purpose – the creation of jobs under the EB-5 program. The Conspirators also intended to distribute Plaintiffs' EB-5 investment monies to Jacquelyn Chan and certain Non-Party Participants as a reward and to compensate them for aiding and abetting their fraud and participating in their conspiracy.  Jacquelyn Chan and certain Non-Party Participants always intended to take Plaintiffs' EB-5 investment monies as a reward and compensation for aiding and abetting the Conspirators in their fraud and participating in their conspiracy

169.    On July 24, 2011, plaintiff Ruimin Chen entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee. A copy of Mr. Chen's Subscription Agreement is attached hereto as Ex. "21."

170.    Mr. Chen funded his investment in the Fund on November 25, 2011.  Under the PPM, incorporated into the Subscription Agreement, Mr. Chen's investment proceeds were to be held in an escrow account and not disbursed by KRC or its principals, Gary Chan or Terry Chan, until after USCIS approved Mr. Chen's I-526 application.  However, the Conspirators stole Mr.

Chen's EB-5 investment proceeds before USCIS approved his I-526 application and used them for their own personal benefit as well for the benefit of Jacquelyn Chan and certain Non-Party Participants, preventing those proceeds from being used for their intended purpose – the creation of jobs under the EB-5 program.  The Conspirators also intended to distribute Plaintiffs' EB-5 investment monies to Jacquelyn Chan and certain Non-Party Participants as a reward and to compensate them for aiding and abetting their fraud and participating in their conspiracy.  Jacquelyn Chan and certain Non-Party Participants always intended to take Plaintiffs' EB-5 investment monies as a reward and compensation for aiding and abetting the Conspirators in their fraud and participating in their conspiracy.

171.    On July 19, 2011, plaintiff Jianli Du entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee. A copy of Mr. Du's Subscription Agreement is attached hereto as Ex. "22."

172.    Mr. Du funded his investment in the Fund on December 12, 2011. Under the PPM, incorporated into the Subscription Agreement, Mr. Du's investment proceeds were to be held in an escrow account and not disbursed by KRC or its principals, the Chans, until after USCIS approved Mr. Du's I-526 application.  Under the PPM, incorporated into the Subscription Agreement, Mr. Du's investment proceeds were to be held in an escrow account and not disbursed by KRC or its principals, Gary Chan or Terry Chan, until after USCIS approved Mr. Du's I-526 application.  However, the Conspirators stole Mr. Du's EB-5 investment proceeds before USCIS approved his I-526 and used them for their own personal benefit as well for the benefit of Jacquelyn Chan and certain Non-Party Participants, preventing those proceeds from being used for their intended purpose – the creation of jobs under the EB-5 program.  The Conspirators also intended to distribute Plaintiffs' EB-5 investment monies to Jacquelyn Chan

and certain Non-Party Participants as a reward and to compensate them for aiding and abetting their fraud and participating in their conspiracy.  Jacquelyn Chan and certain Non-Party Participants always intended to take Plaintiffs' EB-5 investment monies as a reward and compensation for aiding and abetting the Conspirators in their fraud and participating in their conspiracy

173.    On December 6, 2011, plaintiff Jimei Zhang entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee. A copy of Ms. Zhang's Subscription Agreement is attached hereto as Ex. "23."

174.    Ms. Zhang funded her investment in the Fund on December 28, 2011.  Under the PPM, incorporated into the Subscription Agreement, Ms. Zhang's investment proceeds were to be held in an escrow account and not disbursed by KRC or its principals, Gary Chan or Terry Chan, until after USCIS approved Ms. Zhang's I-526 application.  However, the Conspirators stole Ms. Zhang's EB-5 investment proceeds before USCIS approved her I-526 and used them for their own personal benefit as well for the benefit of Jacquelyn Chan and certain Non-Party Participants, preventing those proceeds from being used for their intended purpose – the creation of jobs under the EB-5 program.  The Conspirators also intended to distribute Plaintiffs' EB-5 investment monies to Jacquelyn Chan and certain Non-Party Participants as a reward and to compensate them for aiding and abetting their fraud and participating in their conspiracy. Jacquelyn Chan and certain Non-Party Participants always intended to take Plaintiffs' EB-5 investment monies as a reward and compensation for aiding and abetting the Conspirators in their fraud and participating in their conspiracy.

175.    On July 20, 2012, plaintiff Zhenping Hao entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee. A copy of Mr. Hao's Subscription Agreement is attached hereto as Ex. "24."

176.    Mr. Hao funded his investment in the Fund on July 30, 2012.  Under the PPM, incorporated into the Subscription Agreement, Mr. Hao's investment proceeds were to be held in an escrow account and not disbursed by KRC or its principals, Gary Chan or Terry Chan, until after USCIS approved Ms. Hao's I-526 application.  However, the Conspirators stole Mr. Hao's EB-5 investment proceeds before USCIS approved his I-526 and used them for their own personal benefit as well for the benefit of Jacquelyn Chan and certain Non-Party Participants, preventing those proceeds from being used for their intended purpose – the creation of jobs under the EB-5 program  The Conspirators also intended to distribute Plaintiffs' EB-5 investment monies to Jacquelyn Chan and certain Non-Party Participants as a reward and to compensate them for aiding and abetting their fraud and participating in their conspiracy.  Jacquelyn Chan and certain Non-Party Participants always intended to take Plaintiffs' EB-5 investment monies as a reward and compensation for aiding and abetting the Conspirators in their fraud and participating in their conspiracy.

177.    On July 21, 2012, plaintiff Jie Cui entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee. A copy of Ms. Cui's Subscription Agreement is attached hereto as Ex. "25."

178.    Ms. Cui funded her investment in the Fund on August 2, 2012.  Under the PPM, incorporated into the Subscription Agreement, Ms. Cui's investment proceeds were to be held in an escrow account and not disbursed by KRC or its principals, Gary Chan or Terry Chan, until after USCIS approved Ms. Cui's I-526 application.  However, the Conspirators stole Ms. Cui's

EB-5 investment proceeds before USCIS approved her I-526 and used them for their own personal benefit as well for the benefit of Jacquelen Chan and certain Non-Party Participants, preventing those proceeds from being used for their intended purpose – the creation of jobs under the EB-5 program.   The Conspirators also intended to distribute Plaintiffs' EB-5 investment monies to Jacquelyn Chan and certain Non-Party Participants as a reward and to compensate them for aiding and abetting their fraud and participating in their conspiracy. Jacquelyn Chan and certain Non-Party Participants always intended to take Plaintiffs' EB-5 investment monies as a reward and compensation for aiding and abetting the Conspirators in their fraud and participating in their conspiracy.

179.   On September 5, 2012, plaintiff Guiying Wang entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee. A copy of Mr. Wang's Subscription Agreement is attached hereto as Ex. "26."

180.   Mr. Wang funded his investment in the Fund on September 26, 2012, relying on the Conspirators' false and misleading statements that his $500,000 plus $45,000 in administrative fees would be under the supervision of Joseph Chen and would not be spent without his approval, and in no event, unless and until his I-526 was approved by USCIS.

181.   Each of the Plaintiffs received confirmation that their $500,000 investment and $45,000 administrative fee had been received.

182.   Upon investing their money with KRC, Plaintiffs become Limited Partners in the Fund pursuant to the Limited Partnership Agreement attached at Ex. "27" (the "Limited Partnership Agreement").   On information and belief, Plaintiff Guiying Wang was also subject to the Limited Partnership, which will be confirmed in discovery.   In the event Mr. Wang is subject

to a different version of the Limited Partnership Agreement, Plaintiffs' reserve the right to file it with the Court as an additional exhibit.

183.    In providing their money, the Initial Chinese Victims relied upon the representation that there was a 100% guarantee by the State of Ohio for the return of their investments in the event their I-526's were denied.

184.    In providing their money, the Initial Chinese Victims relied upon the representations regarding escrow accounts, and understood that their money would be held in escrow unless and until USCIS approved their Form I-526's.  The Additional Chinese Victims relied upon the representations regarding the fact that their money would remain untouched and would not be spent unless and until their I-526's were approved by USCIS.

185.    In providing their money, Plaintiffs relied upon the representation that if their I-526's were denied, every penny of their funds would be returned.

186.    In providing their money, the Initial Chinese Victims relied upon the representation their EB-5 investments were not the only monies being invested in the Project, because if they were, it would significantly and materially increase and magnify the chances that the Project would fail.  Plaintiffs relied on the representation that the total amount of EB-5 investments being sought would make up less than 50% of all monies being invested in the Project.

187.    In providing their money, the Initial Chinese Victims relied upon the representation that JPMorgan Chase Bank, N.A. had guaranteed financing of a maximum of $20 million of financing for the Project, because bank financing from a "famous" bank like JPMorgan Chase Bank, N.A. would insure the smooth completion of the Project.

188.    In providing their money, the Initial Chinese Victims relied upon the representation that other economic and social organizations had invested $16 million in the Project, because investments of that magnitude by prominent Cincinnati organizations made the Project appear stable and secure.

189.    In providing their money, the Initial Chinese Victims and the Additional Chinese Victims relied upon the representation that their funds would be exclusively invested in the Short Vine Entertainment District to create EB-5 jobs by helping to renovate, develop and operate the Project, thus generating revenue and creating more than enough jobs to satisfy the 10 jobs per visa requirement of the EB-5 program.

190.    In providing their money, Plaintiffs relied upon the representation that their funds would be used exclusively to develop the Project and create at least ten (10) jobs per investor.

191.    In providing their money, the Initial Chinese Victims relied upon the representation that the Project would be complete within a year of obtaining the necessary EB-5 investors.

192.    In providing their money, the Initial Chinese Victims relied upon the representation that KRC would be able to rent to technology and medical technology companies and to invest in them as well, in order to create revenue streams and cash-in on expansion and growth with respect to equity investments, all the while being kept in the dark about the fact that the regional center was not approved to do either, and the Ohio Defendants knew it.

193.    In providing their money, the Initial Chinese Victims relied upon the representation that the job count for the Project was 551 EB-5 jobs, while the Project needed only 400 jobs.  The Additional Chinese Victims were told and relied upon a different lie, that the Project was 423 EB-5 jobs, while the Project needed only 400 EB-5 jobs.

194.    When the Initial Chinese Victims were ready to send their money to the escrow accounts they were promised their investments would be put into, problems began almost immediately.  Sending money from China to the United States is a very time consuming and complicated process.  Each person is limited to sending $50,000 per year to the United States, so each investor had to have ten friends or relatives send $50,000 each to the escrow account in order to get the entire $500,000 to KRC.  It was KRC's sole responsibility to get the escrow account properly opened so that the Plaintiffs' money would end up where they were promised it would go.  However, according to KRC, they were unable to properly get the escrow account opened.  In any event, the bottom-line is that Plaintiffs were informed that the money that they had undertaken such efforts to wire into the escrow account, using wiring instructions specifically provided to them by Ohio Defendants, had been "bounced-back" to them.  This caused tremendous headaches for the investors, who were unsure whether they would be able to get the funds re-wired to the United States.  There are several emails which evidence the failure of the escrow account the Initial Chinese Victims were directed to us.

195.    For example, in an email from Gary Chan to Joseph Chen (Beijing Catone) dated August 28, 2011, Gary Chan says "we need to talk now about the escrow process and investors who are transferring now."  A copy of the August 28, 2011 email is attached as Ex. "28."

196.    As demonstrated in an August 30, 2011 email from Terry Chan to Joseph Chen (Beijing Catone) the initial explanation given for the "bounce-backs" of the investors' EB-5 investment monies was that the word "fund" appeared improperly in the title of the escrow account.  A copy of the August 30, 2011 email from Terry Chan to Joseph Chen is attached as Ex. "29."

197.    Despite the indication in the August 30, 2011 email from Terry Chan to Joseph Chen, the flaws (whether accidental or intended) with the escrow account were never corrected by the Conspirators.   Ultimately, the Initial Chinese Victims were provided with wiring instructions for a different account, which turned out to be a KRC operating account rather than an escrow account, in blatant violation of The KRC Conspirators and Non-Party Participants repeated oral and written representations, as well as the terms of the PPM.   Even more egregiously, the Conspirators repeatedly assured the immigration consultants and agents, who in turn reassured the Initial Chinese Victims, that the investors' EB-5 investment proceeds would still be held in "escrow," and be "completely safe," unless and until their I-526's were approved. Since these new "lulling" misrepresentations were identical to and consistent with all of the false and misleading statements regarding the escrow account that had come before, the Initial Chinese Victims continued to trust the Conspirators and relied upon them, believing that their money was safe and protected until their I-526's were approved.

198.    The Conspirators, however, had other plans.  Rather than leaving the EB-5 money in KRC's account until such time as the Initial Chinese Victims' I-526's were approved, the Conspirators immediately took the money and spent it on themselves, their friends and family members, including Jacquelyn Chan and certain Non-Party Participants, and any number of things that were all illegal uses of EB-5 investments.  None of the EB-5 investments were used for their proper purpose – the creation of jobs to support the issuance of EB-5 visas.  The Conspirators also intended to distribute the Initial Chinese Victims ' EB-5 investment monies to Jacquelyn Chan and certain Non-Party Participants as a reward and to compensate them for aiding and abetting in their fraud and participating in their conspiracy.  Jacquelyn Chan and certain Non-Party Participants always intended to take Plaintiffs' EB-5 investment monies as a

reward and compensation for aiding and abetting the Conspirators in their fraud and participating in their conspiracy.

199.    As investors continued to send money to KRC, it was important to Terry Chan and Gary Chan that they control the process, including the information that the immigration counselors and agents were permitted to see and pass along to their clients.  They wanted to make sure that they got every penny of the money they were intending to steal.  For example, in an email dated October 20, 2011 from Gary Chan to Monica Yang, Gary wrote" "Please send me the completed forms for the Tangshan investors CHEN Ruimin and REN Wei so I can confirm the information before you send to the Tangshan consultant."  He went on to say "[l]et's make sure these transfers are done properly, send me the forms ASAP so I can review."  A copy of Gary Chan's October 20, 2011 email is attached as Ex. "30."

200.    It was not just Terry Chan and Gary Chan who were waiting to get their hands on the Initial Chinese Victims' money so they could take it for themselves (shattering Plaintiffs' long-held beliefs that their money would remain safe and untouched in escrow until their I-526 applications were approved).  While Gary Chan and Terry Chan were forcing Plaintiffs to jump through hoops to wire their money into KRC's fake escrow account, Angiulli, Jeffrey Jacobs and Jacquelyn Angiulli Chan were also chomping at the bit waiting for the money.  And email dated November 14, 2011 shows both the tortured path the Initial Chinese Victims were forced to take to wire their money to the United States as well as the list of characters waiting to take it as soon as it arrived.  A copy of the November 14, 2011 email is attached as Ex. "31."

201.    Of course, the immigration consultants and agents, as well as the Initial Chinese Victims, were completely unaware of the fact that the Initial Chinese Victims' EB-5 investments were not being held in an escrow account until their I-526's were approved.  They were equally

unaware that the Initial Chinese Victims' EB-5 investments were instead diverted to KRC's operating account. In addition, they were kept in the dark about their money being stolen by the KRC Conspirators and the Non-Party Ohio Defendants and not being used for the purposes permitted under the EB-5 program – development of the Project and creation of EB-5 jobs sufficient to support their visas. Throughout all relevant times, until the truth was discovered, the KRC Conspirators and Non-Party Participants, individually and on behalf of KRC, did everything in their power to lull Plaintiffs into believing all of their lies, convincing the Initial Chinese Victims that: (a) the Project was moving ahead as planned; (b) their monies were safe and sound in the escrow account; (c) their investments were 100% safe because they were backed by a guarantee created by the State of Ohio; (d) there was institutional financing as well as economic and social investment monies in place; and (e) there were jobs being created. Because the KRC Conspirators and Non-Party Participants had become fiduciaries and convinced the immigration consultants and agents to trust them, and because the immigration consultants and agents had convinced the Initial Chinese Victims to trust the KRC Conspirators and Non-Party Participants, the Initial Chinese Victims continued to believe in and rely on the KRC Conspirators and Non-Party Participants up until the time the harsh realities of the KRC Conspirators and Non-Party Participants' massive fraud were revealed.

202. Of course, the immigration consultants and agents, as well as the Additional Chinese Victims, were completely unaware of the fact that the Additional Chinese Victims' EB-5 investments were not being held in an escrow account until their I-526's were approved. They were equally unaware that the Additional Chinese Victims' EB-5 investments were instead diverted to KRC's operating account. In addition, they were kept in the dark about their money being stolen by the Conspirators and not being used for the purposes permitted under the EB-5

program – development of the Project and creation of EB-5 jobs sufficient to support their visas. Throughout all relevant times, until the truth was discovered, the KRC Conspirators and Non-Party Participants, individually and on behalf of KRC, did everything in their power to lull Plaintiffs into believing all of their lies, convincing the Additional Chinese Victims that: (a) the Project was moving ahead as planned; (b) their monies were safe and sound and would not be spent unless and until their I-526's were approved by USCIS; and (c) there were jobs being created. Because the KRC Conspirators and Non-Party Participants had become fiduciaries and convinced the immigration consultants and agents to trust them, and because the immigration consultants and agents had convinced the Additional Chinese Victims to trust the KRC Conspirators and Non-Party Participants, the Additional Chinese Victims continued to believe in and rely on the KRC Conspirators and Non-Party Participants up until the time the harsh realities of the KRC Conspirators and Non-Party Participants' massive fraud were revealed.

203.   In order to continue to fulfil their obligations, each of the investors diligently submitted all necessary paperwork in conjunction with their I-526's, asserting eligibility based on an investment in a Regional Center through the Short Vine Entertainment District. The I-526's for all Plaintiffs were submitted to USCIS by March, 2012. Each I-526 is in excess of 400 pages long and therefore they have not been attached as exhibits. In the event the Court wishes to inspect the I-526's, Plaintiffs' counsel will make them available.

204.   Plaintiffs were approved as accredited investors and their 526's were accepted within KRC's program for the Short Vine Entertainment District investment for further consideration by USCIS.

## The Fraud and Theft are Discovered

205.   By the time that Plaintiffs' I-526's were submitted to USCIS in March 2012, Ohio Defendants had already stolen Plaintiffs' EB-5 investments and used the funds for their own

purposes, all of which were inconsistent with the terms of the PPM and EB-5 program requirements.  None of this was known to Plaintiffs at the time their I-526's were submitted to USCIS.

206.    More specifically, by February 2012, over $4 million of the Plaintiffs' investment funds had been improperly spent by the Ohio Defendants, with little to no development done on the Project, which was supposed to create EB-5 jobs so Plaintiffs could get their permanent resident visas approved through USCIS.

207.    For example, Angiulli funneled approximately $700,000 to his family members and Jacquelyn Chan and certain Non-Party Participants, and that provided no meaningful services on the Project. Family members were hired and paid for sham positions like human resources manager for a company with less than five actual employees.

208.    In addition, $400,000 of Plaintiffs' money was invested in technology companies, like Zipscene, Wearcast and The Source, which was inconsistent with the Fund's business plan and KRC's regional center charter.  On information and belief, those technology companies have not provided any return of capital to the Fund or the Plaintiffs.

209.    Further, Angiulli used several thousands of dollars of the Plaintiffs' investments to pay the mortgages and taxes on properties he and/or his alter ego company defendant Angiulli, Inc. owned Angiulli also diverted thousands of investor dollars to pay expenses for his restaurant, Martino's.  None of these expenditures were proper uses of EB-5 investment dollars.

210.    Moreover, on December 21, 2011, Angiulli used investor funds to purchase the Colonade, a parcel of property located at 2718 Vine Street, Cincinnati, Ohio. The Colonade generated $13,000 in rental income per month. Yet, despite receiving such rental income from

the Colonade, the money went into Angiulli's pocket, rather than into SV ARX for the benefit of the Project.

211.    Then, the Colonade was also used as collateral for a $250,000 line of credit with U.S. Bank. Angiulli and Terry Chan drew down the $250,000 line of credit and split the proceeds instead of using the proceeds to benefit the Project. When the Colonade was eventually sold, the line of credit was paid off from the sales proceeds. This was another $250,000 taken from investor funds.

212.    Plaintiffs did not learn of these improper expenditures until much later, long after they invested.

213.    Between February and May 2012, KRC continued their practice of lulling by continuing to assure Beijing Catone that Plaintiffs' funds were safe and well managed.

214.    Because the number of investors who were interested in investing in the Project had slowed, during the first quarter of 2012, Gary Chan, Terry Chan and Angiulli began to push Beijing Catone to bring in more investors, and offered Joseph Chen and Chen Hao positions as members of the board of SV ARX as well.  Gary Chan, Terry Chan and Angiulli retained an 85% interest in SV ARX, but purportedly gave Beijing Catone the right to veto any expenses.  Thus, Gary Chan, Terry Chan and Angiulli, individually and on behalf of KRC, lured Beijing Catone into looking for more investors for the Project by convincing them that the existing investors' EB-5 money was safe, that the Project was doing well, and that Joseph Chen and Chen Hao would have veto power over how any expenses would be incurred on the Project in the future. Relying on these additional false and misleading representations, Beijing Catone went about trying to locate additional potential EB-5 investors for the Project.  This was a critical and material fact to the Additional Chinese Victims because, combined with the representation that

their money would remain untouched and would not be spent unless and until their I-526's were approved, it was the driving force behind their individual decisions to invest in the Project.

215.    By September 2012, nine restaurants were to have been developed. However, at this time, without the knowledge of the immigration consultants and agents or the Plaintiffs, the Project was put on hold and the restaurants were nowhere near completion due to disputes between the Conspirators over funding for the Project. The Project was out of money and SV ARX, Angiulli and Jeffery Jacobs were demanding more money from the Gary Chan, Terry Chan, KRC and the Fund. Gary Chan, Terry Chan, KRC, the Fund, SV ARX, Angiulli and Jeffery Jacobs were all accusing each other of misappropriating the Plaintiffs' EB-5 investment funds.  The reality was that all of them had misappropriated Plaintiffs' EB-5 investment funds and did little to advance the Project forward.

216.    Ohio Defendants failed to notify the immigration consultants and agents or the Plaintiffs of the problems and infighting taking place on the Project. Instead, the Conspirators proceeded to solicit further investments from unsuspecting Chinese investors.

217.    Without any disclosure as to the problems that were rampant on the Project, three more investors, the Additional Chinese Victims were lured into investing in the Fund.  They all fell victim to the fraudulent scheme.

218.    The disagreements between Gary Chan and Terry Chan, on the one hand, and SV ARX, Angiulli and Jeffery Jacobs, on the other, continued even after three more investors were lured into the Fund. As a result, on December 21, 2012, SV ARX and Angiulli filed suit against the Fund, Gary Chan and Terry Chan in the Hamilton County, Ohio, Court of Common Pleas, Case Number A1209855 (the "Who Stole What Litigation").  The allegations of the claims and counterclaims in the Who Stole What Litigation are both telling and provide additional support

for the KRC Conspirators' scienter.  The Complaint With Jury Demand Endorsed Hereon in the Who Stole What Litigation (the "Complaint") is attached as Ex. "32."

219.    Paragraph 16 of the Complaint alleges that Terry Chan and Gary Chan held themselves as, and held themselves out to be, experts in EB-5 investment-related matters.  They did the same thing to Plaintiffs in this case.

220.    Paragraph 19 of the Complaint admits that every dollar of Plaintiffs' EB-5 investment monies was "required to be invested into a job-creating project…approved pursuant to EB-5 guidelines."  Clearly Ohio Defendants in this case knew what they were supposed to do with Plaintiffs' EB-5 investments, but instead they stole the money.

221.    Paragraph 20 of the Complaint admits that "None of the $500,000 investment for each investor was permitted to be used…for any use other than for the approved Project."

222.    Paragraph 29 of the Complaint tells how Terry Chan stole $500,000 of Plaintiff's EB-5 investment monies and transferred the money to various entities for "non-approved, non-Project related matters." Since all of the Initial Chinese Victims' money was to be held in the escrow account pending approval of their I-526's, and none of the Additional Chinese Victims' money was supposed to be touched or spent unless and until their I-526's were approved, Terry Chan should not have, and should not have been able to, touch any of this money at all, let alone steal it for his own personal use.

223.    Paragraph 31 of the Complaint tells how Terry Chan made an improper and illegal investment in Wearcast, an information technology company, in violation of the requirements of the EB-5 program.  This "investment" was also contrary to the approved businesses for the regional center and was done as part of the false and misleading statements

and marketing materials disseminated to the immigration consultants and agents, as well as to the Initial Chinese Victims.

224.    Paragraph 36 of the Complaint describes a similar improper and illegal investment in a technology company called The Source, LLC, in which, on information and belief, Terry Chan had an ownership interest, again in violation of EB-5 requirements.  The Source, LLC is now out of business and no longer exists.

225.    Paragraph 40 of the Complaint describes another illegal $250,000 transfer by Terry Chan to a technology company called ZipScene.  All of the funds that Terry Chan is being accused of stealing by his fellow Ohio Defendants should have been in the escrow account or, with respect to the Additional Chinese Victims, some other account, 100% safe and secure, never to be spent until such time as Plaintiff's I-526's had been approved.

226.    Paragraphs 41 and 44 of the Complaint discuss yet another $469,000 of transfers out of the Fund's account, with no explanation of where the money went or what it was used for. Once thing that is clear is that it was not used for the Project and it was not used to create jobs under the EB-5 program.  That $469,000 was never supposed to leave the escrow account(s) or, as to the Additional Chinese Victims, whatever other account it was to be held in pending I-526 approval by USCIS.  But Terry Chan took it for his own use.  Rather than worrying about giving the Plaintiffs their money back, or about their breaches of their fiduciary duties to Plaintiffs, the Non-Party Participants decided that the better use of their time was to fight the KRC Conspirators over who got to steal more of the EB-5 investment money.

227.    In sum, as set out in Paragraph 48 of the Complaint, "Terry Chan has used his position of control…to benefit himself and his private interests to the detriment of the Fund…." "He has failed to use proper corporate procedures, has used bank accounts of the Fund…to make

improper payments to himself and third parties that benefitted himself but not the Fund…for the sole purpose of benefitting himself and his outside business interests, to the detriment of…the Fund."  For all of these reasons, alleged by his own father-in-law, the Court should pierce the corporate veil of any and all corporations that Terry Chan used to implement his fraudulent scheme.

228.    In Paragraph 41 of the Counterclaim filed in the Who Stole What Litigation (the "Counterclaim"), not to be undone and stand pat while being accused of stealing Plaintiffs' EB-5 proceeds, Terry Chan caused KRC to turn right around and accuse Jeffery Jacobs of converting $500,000 of Plaintiff's money "to SV ARX, or to himself and/or others, without KRC's authorization and against its express authorization."  A copy of the Counterclaim is attached as Ex. "33."  The fight between the Conspirators makes one thing perfectly clear – Plaintiffs are innocent victims of greed and Ohio Defendants no doubt stole their money.

229.    On or about June 11, 2013, Ohio Defendants settled the Hamilton County litigation. After settlement of that litigation, Angiulli purchased KRC from Terry Chan and Gary Chan for $300,000, in January 2014, again improperly using Plaintiffs' EB-5 investor funds.

230.    After Hao Zhenping and Cui Jie had invested their EB-5 money, Beijing Catone learned that Hao Zhenping's money had been used without Joseph Chen's knowledge or approval.  In other words, Joseph Chen was never given an opportunity to exercise his "veto power" over the expenses for the Project.  At that time, Guiying Wang's funds were already on their way to Ohio Defendants.

231.    Concerned about what he had learned about Hao Zhenping's money, Beijing Catone began asking for records from SV ARX and KRC regarding everything that had been spent on the Project.  Ohio Defendants failed to provided Beijing Catone with any financial

books and records, constantly making excuses and putting it off, but always reassuring (i.e., lulling) Joseph Chen into believing that everything was ok, that the original $3,500,000 in EB-5 investments was still safe and that Guiying Wang's money had not been spent either.

232.    After having been put off by Ohio Defendants and growing wary of their excuses and delays, in late September 2012, Joseph Chen again traveled to Cincinnati.  During that trip, for the very first time, Joseph Chen was able to obtain some very limited information regarding the whereabouts of Plaintiffs' EB-5 investments.  What he learned was shocking and shook him to his core.

233.    Beijing Catone and Joseph Chen learned, through the very limited amount of information he was finally able to extract from Ohio Defendants, that the original $3,500,000 from the Initial Chinese Victims, the first 7 investors, was not being held in escrow.  Contrary to the repeated and continuous representations of Gary Chan, Terry Chan, Angiulli, Jeffery Jacobs, individually and on behalf of KRC, the PowerPoint and the Brochure, Ohio Defendants never put Plaintiffs' money in escrow to be kept 100% safe and secure until Plaintiffs' I-562's were approved.  Instead, they put Plaintiffs' savings in an operating account and Ohio Defendants' stole their money for their own personal use.  Among the first thefts that came to light was Terry Chan's theft of $500,000 that he "invested" in high-tech projects, businesses that were not approved businesses of the regional center and which did not create jobs under the EB-5 program.  Another readily apparent theft was $700,000 taken by Angiulli and distributed to him and just about everyone in his family, together with others, including Jacquelyn Chan and certain Non-Party Participants.

234.    When confronted with the question of how they could possibly justify stealing all of the EB-5 investors' money when it was supposed to be in escrow or, as to the Additional

Chinese Victims, some other account, until their I-526's were approved, Joseph Chen was told that "if you did not use funds to create jobs, everyone had problems with the I-526 applications." He was also told "other regional centers are doing the same thing."  At this time, Ohio Defendants also admitted that they had already spent Plaintiff Guiying Wang's $500,000 as well, bringing the total of stolen funds to $5,000,000.  The irony of this final set of Ohio Defendants' lies is that by spending the EB-5 investments before the I-526's were approved, they not only violated EB-5 program requirements but assured that the I-526's would ultimately by rejected.  In addition, not one cent that they stole and used for their own desires did anything to create any significant number of EB-5 jobs.  The only thing Ohio Defendants accomplished was defrauding the Initial Chinese Victims and the Additional Chinese Victims, all of whom trusted them right up until the bitter end.

235.    In September 2012, once Beijing Catone learned of the chaos that Ohio Defendants had created, no more investors were being sought.

236.    Although no other potential investors were being sought, through Joseph Chen, and with the help of Hao Chen, Beijing Catone was searching for a way to minimize and mitigate Plaintiffs' damages by trying to salvage the Project.  The hope was that if the Project could somehow be completed, sufficient EB-5 jobs could be created for Plaintiffs to get their I-526's approved so they could become permanent residents of the United States, and maybe their investments could someday be recovered as well.

237.    In order to try and move the Project forward, Joseph Chen and Hao Chen had several lengthy conference calls with Terry Chan and Gary Chan, imploring them to acknowledge and follow the requirements of the EB-5 program and to finish the Project, at least to the extent necessary to fulfill the promises that had been made to the Initial Chinese Victims

and the Additional Chinese Victims.  Although Terry Chan and Gary Chan seemed to be willing to do so, in October 2013, Ohio Defendants finally stopped concealing that the Project was stalled and that there was infighting between Gary Chan and Terry Chan, on the one hand, and Angiulli and Jeffery Jacobs, on the other.

238.    At this point, Beijing Catone and Plaintiffs decided to wait for the USCIS response to Plaintiffs I-526's and then decide what to do next.  Shortly thereafter, on October 15, 2012, Joseph Chen and Plaintiffs decided to suspend the operation of SV ARX in order to protect the Plaintiffs and the Project.  The next day, on October 16, 2012, Angiulli purported to "terminate" Joseph Chen from SV ARX, and warned him that if he attempted to oppose Angiulli's power play.  Later, Angiulli would threaten to speak to the USCIS and "blow-up" the investors' I-526's.  Angiulli's threat to prevent Plaintiffs from having their I-526's approved was too big a risk for Plaintiffs to take.

239.    Upon investigation, Plaintiffs discovered that a seemingly endless laundry list of fraudulent representations were perpetrated upon them in furtherance of obtaining and stealing their money.

240.    The Initial Chinese Victims have discovered that their funds were not held in escrow account(s) unless and until their I-526's were approved.  The Additional Chinese Victims have discovered that their funds were not held in an account unless and until their I-526's were approved.

241.    Instead, contrary to all of the written and oral representations, Plaintiffs' funds were deposited into an operating account and pillaged for the personal pleasure of the KRC Conspirators, the Non-Party Participants and Jacquelyn Chan and certain Non-Party Participants.

242.   Virtually none of Plaintiffs' funds were used at the Project, and very few EB-5 jobs were created.

243.   Plaintiffs' investments were not guaranteed by the State of Ohio.

244.   The Project did not have guaranteed financing of up to $20 million by JPMorgan Chase Bank, N.A.

245.   The Project did not have $16 million in "economic and social investments" of non-EB-5 financing.

246.   The Project did not have $6.5 million in backing from the City of Cincinnati.

247.   The Project did not have $22.5 million in non-EB-5 financing in addition to the desired $20 million in EB-5 financing, such that the total of EB-5 financing would be less than 50% of the total financing on the Project.

248.   Each of the representations described hereinabove were knowingly false or misleading when they were made.

249.   Most of the representations within the Offering Documents were knowingly false or misleading when they were made.

250.   The representations that the funds would be exclusively invested in the Short Vine Entertainment District to create jobs by helping to finish the renovation, development and operation of the Project were knowingly false when made.

251.   The representations that the funds would create 10 full-time jobs for each $500,000 advanced were knowingly false when they were made.

252.   The representations that the job count for the project was 551 jobs were knowingly false when they were made.

253.     In sum, the Project at the Short Vine Entertainment District was a systemic fraud, based on myriad, intentional, material misrepresentations intended to dupe unsuspecting, needy foreign investors.

254.     The Project was a necessary façade, used to enable to the fraudulent scheme that bilked foreign investors with the promise of EB-5 visas and security for their investments.

### The Demise of the Regional Center and Plaintiffs' I-526 Applications

255.     In January 2014, nine of the Plaintiffs' I-526 applications were approved by USCIS, granting them conditional resident status in the United States. Plaintiff Guiying Wang's I-526 has never been approved. Under the PPM, it was not until the I-526's were approved that the investors' funds should have been released from the escrow account, but solely for the purpose of developing the Project and creating jobs under the EB-5 program.  Instead, unknown to Plaintiffs, their money had already been misappropriated by Ohio Defendants in violation of the PPM.

256.     While the first nine investors were pleased that USCIS had approved their I-526 applications, this was the last positive news that they would receive on the Project

257.     In September 2014, USCIS sent KRC a Notice of Intent to Terminate KRC as a regional center due to the apparent mismanagement of Ohio Defendants in the use of EB-5 Funds. It was apparent to USCIS that KRC no longer served the purpose of promoting economic growth.  The reasons behind USCIS' decision to terminate KRC's regional center are very instructive and powerful additional evidence of Ohio Defendants' scienter.  A copy of the Notice of Intent to Terminate (the "NOIT") is attached as Ex. "34."

258.     In describing the reasons for termination of KRC's regional center, under the heading "Failure to fully account for EB-5 capital investments" on page 7 of the NOIT, the USCIS references KRC's admission that it spent all $5 million of Plaintiffs' money, including a

$250,000 investment in Zipscene, LLC.  It then chides KRC for being unable to account for $457,704.31 of that money.  In this case, KRC should be made to account for the entire $5 million.

259.    On Page 8 of the NOIT, the USCIS also concludes that KRC is unlikely to continue to serve the purpose of promoting economic growth.  And when you look at the reasons why, there are a number of blatant contradictions between the myriad representations made to the immigration consultants and agents and the Plaintiffs and the admissions Ohio Defendants made, in writing, to USCIS.  For example, KRC's job estimate to USCIS was just 256.9 jobs while KRC told Plaintiffs that 551 jobs would be created.  In addition, Ohio Defendants represented that the Project was going strong, was on track and that there was nothing to worry about.  Yet the USCIS' investigation showed that the permit for the construction phase of the Project was not proceeding according to the timeline that KRC had provided, and that the building permit for façade renovations on one of the buildings had expired.  In addition, there were "no viable building permits" for the Turophilia restaurant and there were no permits necessary to build a new restaurant.  None of these conclusions are consistent with the "everything is proceeding according to plan" lulling representations that Ohio Defendants made right up until the time their fraud was revealed.

260.    On Page 9 of the NOIT, USCIS concluded that "[d]ue to the apparent lack of progress in the construction phase, it does not appear likely that KRC will meet the job creation requirements necessary for existing immigrant investors."  So not only will the Project not generate the 551 jobs promised to the Plaintiffs, or the 256.9 jobs promised to USCIS, but the Project will not even generate the 100 jobs necessary for the 10 investors to ever obtain their permanent green cards so they can stay in the United States.

261.    The USCIS also concluded that the regional center no longer served the purpose of promoting economic growth because KRC failed its monitoring and oversight responsibilities. Indeed, on Page 10 of the NOIT, USCIS pointed to the express language of the Limited Partnership Agreement that made clear that KRC has a fiduciary duty to conduct the affairs of the Fund, including safekeeping and use of all partnership funds and assets for the exclusive benefit of the partnership.  See Ex. "27."

262.    On Page 10 of the NOIT, USCIS then went on to say the channeling of $4,292,295.69 to SV ARX and $250,000 to Zipscene before any I-526's were approved appears to violate the terms of the PPM.  It also clearly violates the long-standing and repeated oral and written representations to Plaintiffs that their EB-5 investments would be held in escrow until their I-526's were approved.  USCIS also found that, contrary to a March 12 statement by Gary Chan and Terry Chan, there was no evidence that investors agreed to eliminate the condition of an escrow account from the PPM.  To be clear, the existence of the escrow account was a critical and material condition precedent to Plaintiffs' EB-5 investments and they would never have invested in the Project without that promise and provision.  At no time did Plaintiffs agree to eliminate the escrow account.

263.    Page 11 of the NOIT discusses Terry Chan's illegal and improper investment in Zipscene.  Ohio Defendants had represented to Plaintiffs that technology related investments and technology related business were permitted as part of the Project and were permitted businesses under the regional center approval.  These were lies.  The NOIT confirms that the Zipscene investment was inconsistent with the approved regional center industries.  Terry Chan's personally motivated investment did not create any jobs under the EB-5 program and was of no benefit to the Project or the Plaintiffs.  Angiulli has represented that KRC's interest in Zipscene

has been sold and the proceeds were deposited into SV ARX's account for use on the Project. As part of the accounting being sought in this case, KRC should include information regarding the purported sale of its interest in Zipscene.

264.    Finally, on page 12 of the NOIT, USCIS references a public statement by Terry Chan in The Cincinnati Business Courier that "The Center has raised $10 million for Short Vine so far and probably could have more…but [Terry Chan] is pacing the fundraising efforts so that the investment does not get too far ahead of the work – or job creation." This lie contradicted what Terry Chan had told the USCIS, that only $5,000,000 had been raised so far, causing USCIS to say "[p]ublic statements that contradict information provided to USCIS undermine the credibility of" KRC's filings with the agency. In this case, the true facts that have emerged, which are diametrically opposed to the false and misleading statements that have been spewed by the Conspirators from their very first meeting with Beijing Catone, should not only undercut Ohio Defendants' credibility with this Court, but should be strongly considered as scienter facts with respect to the KRC Conspirators' fraud.

265.    On October 20, 2014, Angiulli filed his Response to Notice of Regional Center Termination with USCIS (the "NOIT Response") on behalf of KRC. A copy of the NOIT Response is attached hereto as Ex. "35." In the NOIT Response, Angiulli and KRC make some admissions that should be considered by the Court when considering scienter.

266.    On Page 1 of the NOIT Response Angiulli admits that he owned all of the buildings that make up the Project. As stated above, this was never disclosed to Plaintiffs prior to them making their investments. Then, on Page 2, Angiulli concedes that he and Jeffery Jacobs traveled to China to meet with prospective investors. These are the trips during which both Angiulli and Jeffery Jacobs spoke individually and on behalf of KRC, presented PowerPoint

presentations and distributed the Brochures, all of which included the false and misleading statements specifically detailed above.

267.    On Page 3 of the NOIT Response, Angiulli acknowledges that by late 2012, Gary Chan and Terry Chan realized that technology funds may not have been acceptable to USCIS. While Gary Chan and Terry Chan knew that investments in technology funds were off limits from the very moment the regional center was initially approved by USCIS, and should have informed all potential investors that this was the case, clearly, by late 2012, at the latest, Gary Chan and Terry Chan should have disclosed that they had taken Plaintiffs' money out of escrow before their I-526's had been approved and spent the money on investments that violated EB-5 requirements.

268.    In addition, Angiulli admits that he knew, by late 2012 at the very latest, that organizing and offering expenses were not appropriate for use of EB-5 investments.  Despite this knowledge, which he actually knew from the very outset of his involvement in the Project, he did nothing whatsoever to inform Plaintiffs that their money had been taken out of escrow before their I-526's had been approved and been spent in violation of EB-5 requirements.

269.    Most importantly, on Page 6 of the NOIT Response, Angiulli and KRC admit unequivocally that Plaintiffs' entire $5,000,000 EB-5 investment was taken out of escrow, or never put into escrow, in violation of the PPM and every prior representation made to them that their money would be 100% safe and untouched until their I-526's were approved.  Angiulli and KRC also admit that between them and Gary Chan and Terry Chan, they have all of the records necessary to provide an accounting of where all of Plaintiffs' stolen money went.

270.    On Page 9 of the NOIT Response, Angiulli and KRC state "[o]f course our permits expired, and we did not immediately obtain new ones given the lack of available capital

to use them." This statement is especially shocking and indicative of Ohio Defendants' scienter as they made numerous false and misleading statements as to the availability of tens of millions of dollars of bank financing and private investments. Yet here they admit that after stealing Plaintiffs' money, they did not even have enough money to pull permits. This should easily demonstrate a "strong inference of the required state of mind." At the time Ohio Defendants made the false and misleading statements about non-EB-5 financing, they absolutely knew that they did not have dime one of $20 million dollars in "guaranteed" bank financing from JPMorgan Chase Bank, N.A. or $16 million dollars in "economic and social" investments from CincyTech Fund II, Ohio Third Frontier, Cincinnati Children's Hospital and U.S. Bank Foundation.

271.    On February 13, 2015, USCIS terminated the designation of KRC –Kentucky Regional Center DBA Midwest EB-5 Regional Center as a regional center under the Immigrant Investor Program pursuant to Title 8 of the Code of Federal Regulation, Section 204.6(m)(6) (the "Notice of Termination"). A copy of the Notice of Termination is attached as Ex. "36."

272.    In the Notice of Termination, USCIS made a number of findings, including; (a) many expenditures were inconsistent with the Project business plan and with EB-5 job creating purposes generally; (b) many of the expenditures categorized as hard or soft construction costs were not legitimate Project expenditures, including $165,477.75 for "Tech Fund" to Terry Chan as well as payments for "organizing and marketing expenses including trips to China;" (c) costs categorized as "utility work, interior demolition and roof work" include "Jeff China Trip," "Las Vegas EB-5 conference," "London trip," and "Offering Documents," none of which are proper EB-5 job creating purposes; (d) the purchase of KRC by Angiulli from Gary Chan and Terry Chan was funded with EB-5 investors' capital; (e) the Colonade was purchased using EB-5

investors' money; and (f) $222,475.75 was improperly transferred to Terry Chan in October 2011. As a result of these shenanigans, the same acts that underline Plaintiffs' claims here, USCIS terminated KRC as a regional center.

273. After terminating KRC as a regional center, USCIS then revoked 9 of the Plaintiffs' I-526 approvals and denied Guiying Wang's I-526. Plaintiffs are appealing USCIS's actions, but their visas are in serious jeopardy.

274. At this point, Plaintiffs have collectively lost every penny of their $5,000,000 investments. Even more heartbreaking than losing their lifesaving is the loss of Plaintiffs' I-526 approvals, which should have led to their obtaining permanent United States visas. Because of their unbridled greed and deceit, Ohio Defendants have placed the Plaintiffs in a disastrous position.

## Ohio Defendants' Receipt of Stolen Funds

275. Plaintiffs have determined, by investigating the money trail, that Jacquelyn Chan and certain Non-Party Participants were parties to a conspiracy to steal Plaintiffs' funds with several persons involved with the project, including Gary Chan, Terry Chan, Angiulli and Jeffery Jacobs and entities that they owned and/or controlled.

276. Plaintiffs, following directions provided to them by Gary Chan and Terry Chan wired their money into what they believed to be escrow accounts, where they were told their money would stay, 100% safe and untouched, until such time as their I-526 applications were approved by USCIS. Jacquelyn Chan and certain Non-Party Participants also aided and abetted the Conspirators in their fraudulent scheme and all of their other tortious acts, conspiring with them to accomplish their fraudulent ends. Moreover, Jacquelyn Chan and certain Non-Party Participants took Plaintiffs' EB-5 investment monies as a reward and compensation for their

efforts, converting Plaintiffs' funds.  In addition, each of Jacquelyn Chan and certain Non-Party Participants were unjustly enriched at Plaintiffs' expense.

277.    Instead, their money ended-up in an operating account that was set-up, owned and/or controlled by KRC, Gary Chan, Terry Chan, Angiulli and Jeffery Jacobs.

278.    Once Plaintiffs' funds ended-up in the operating account that was set-up, owned and/or controlled by KRC, Gary Chan, Terry Chan, Angiulli and Jeffery Jacobs, all of Plaintiffs' EB-5 investments were quickly used for non-allowable, non-EB-5 job creating purposes.  KRC, Gary Chan, Terry Chan, Angiulli and Jeffery Jacobs siphoned off millions of dollars for personal expenses and investments and used the funds to pay off participants in the fraudulent scheme, including their co-conspirators and aiders and abettors, Jacquelyn Chan and certain Non-Party Participants.

279.    On information and belief, Jacquelyn Chan and certain Non-Party Participants were intimately knowledgeable about and informed of the nature and purpose of both the EB-5 program (including the proper uses of EB-5 investments) and the KRC Conspirators and Non-Party Participants' scheme, and thus knew or should have known that none of Plaintiffs' funds could be used unless and until Plaintiffs' I-526's had been approved by USCIS.

280.    Before any of Plaintiffs' I-526 petitions were approved by USCIS, KRC, Gary Chan, Terry Chan, Angiulli, and Jeffery Jacobs took Plaintiffs' money anyway, further demonstrating their fraudulent intent.  Moreover, when they gave Plaintiffs' money away to Jacquelyn Chan and certain Non-Party Participants, Jacquelyn Chan and certain Non-Party Participants also knew or should have known that Plaintiffs' money did not belong to them, demonstrating both their culpability and complacency as well as their aiding and abetting of Ohio Defendants' fraudulent scheme.

281.    Further, KRC, Terry Chan, Gary Chan, Angiulli and Jeffery Jacobs owed Plaintiffs a fiduciary duty to protect their funds, and not allow their release, unless and until their I-526's were approved by USCIS.

282.    As a result of the improper and illegal transfers to Jacquelyn Chan and certain Non-Party Participants, they were unjustly enriched as a result of the theft of Plaintiffs' funds. Jacquelyn Chan and certain Non-Party Participants allowed themselves to be paid compensation from Plaintiffs' funds while they assisted in the theft and dissipation of the funds, thus converting Plaintiffs' funds.  In addition, all Ohio Defendants are guilty of civil theft.

283.    Ohio Defendants acted with willful, reckless, grossly negligent and malicious intent in taking the actions alleged hereinabove.

284.    As a result of Ohio Defendants' willful, reckless, grossly negligent and malicious conduct, they are libel for exemplary and punitive damages.

285.    Plaintiffs are in need of some good news and a helping hand.

286.    Plaintiffs have filed suit against the Ohio Defendants in the Ohio Case alleging substantially identical facts to those alleged hereinabove.

287.    The Ohio Case is pending.

**COUNT I – Dischargeability of Debts Under 11 U.S.C. § 523(a)(2)(A)**

288.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 287 as if fully stated fully herein.

289.    The Debtors made false representations with intent to deceive Plaintiffs.

290.    Plaintiffs relied on such representations.

291.    Plaintiffs' reliance was justified.

292.    Plaintiffs have suffered losses as a result of such representations, which are alleged in the Ohio Case.

**COUNT II – Dischargeability of Debts Under 11 U.S.C. § 523(a)(2)(B)**

293.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 287 as if fully stated fully herein.

294.    The Debtors issued writings to Plaintiffs that were materially false.

295.    Such writings resulted in the debts that are the subject of the Ohio Case.

296.    Such writings respected the Debtors' or an insider's financial condition.

297.    Plaintiffs reasonably relied on such writings.

298.    The Debtors published such writings with the intent to deceive.

**COUNT III – Dischargeability of Debts Under 11 U.S.C. § 523(a)(4)**

299.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 287 as if fully stated fully herein.

300.    The Debtors owed fiduciary duties to Plaintiffs.

301.    The Debtors committed fraud or defalcation while acting in their capacities as fiduciaries to Plaintiffs.

302.    Such actions by the Debtors have resulted in damages to Plaintiffs, which are alleged in the Ohio Case.

303.    Property of Plaintiffs was rightfully in possession of the Debtors, who are non-owners.

304.    The Debtors appropriated such property for their personal use.

305.    Such appropriations by the Debtors have resulted in damages to Plaintiffs, which are alleged in the Ohio Case.

306.    The Debtors fraudulently took and carried away Plaintiffs' property with intent to convert such property without Plaintiffs' consent.

307.    Such takings and carrying away by the Debtors have resulted in damages to Plaintiffs, which are alleged in the Ohio Case.

### COUNT IV – Dischargeability of Debts Under 11 U.S.C. § 523(a)(6)

308.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 287 as if fully stated fully herein.

309.    The Debtors willfully inflicted injury on Plaintiffs by committing intentional acts, the purpose of which were to cause injury or substantially certain to cause injury.

310.    The Debtors maliciously inflicted injury on Plaintiffs by committing acts that were wrongful and without just cause or excessive even in the absence of personal hatred, spate or ill will.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against the Debtors (1) determining the debts against the Debtors alleged herein, and in or otherwise related to the Ohio Case, to be non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), 523(a)(4) and 523(a)(6); and (2) granting Plaintiffs such other and further relief as this Court may deem just and proper.

Dated September 7, 2018

SHRAIBERG, LANDAU & PAGE, P.A.
Attorneys for Plaintiffs
2385 NW Executive Center Drive, Suite 300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
Email:  plandau@slp.law
Email:  pdorsey@slp.law

By:  ___/s/ Philip J. Landau_____
              Philip J. Landau, Esq.
              Fla. Bar. No. 0504017
              Patrick Dorsey, Esq.
              Fla. Bar. No. 0085841

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via Notice of Electronic Filing by CM/ECF to all parties registered to receive such service in this case on this the 7th day of September, 2018.

_/s/ Philip J. Landau_
Philip J. Landau, Esq.